COMMONWEALTH *vs.* EUGENE G. MCKENNA
(and four companion cases).

Suffolk.   November 4, 1968. — February 5, 1969.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, KIRK, SPIEGEL, & REARDON, JJ.

*Constitutional Law,* Assistance of counsel, Admissions and confessions, Waiver of constitutional rights. *Practice, Criminal,* Assistance of counsel. *Evidence,* Admissions and confessions, Sketch. *Waiver. Homicide.*

Where it appeared in a murder case that upon arrest the defendant had requested that his counsel be called, that at a police station the defendant was given the full constitutional warnings required by *Miranda* v. *Arizona,* 384 U. S. 436, and advice as to his right to telephone under G. L. c. 276, § 33A, and signed appropriate waivers relat-

Commonwealth *v.* McKenna.

ing thereto, that he did not request the presence of his counsel at any interrogation, that then in response to questions by a police sergeant the defendant told the complete "story" of the murder in narrative form, that during the interrogation the defendant's counsel talked by telephone with a police lieutenant who transferred the call to the sergeant, and that the sergeant, upon counsel identifying himself and expressing a wish to be present at any interrogation, did not state that it was then going on and was so evasive that a consultation was forestalled between counsel and the defendant, who was not informed of his counsel's call, it was held that it was reversible error to deny a motion to suppress as to so much of the interrogation as took place after the talk of counsel with the police officers. [324–325]

It was reversible error to deny a motion by the defendant in a murder case to suppress an inculpatory statement made by him to a police sergeant and other police officers where it appeared that at the time of the defendant's arrest he requested notification of his counsel and his counsel requested to speak on the telephone with the defendant, that the sergeant knew of both requests but refused counsel's request, that on arriving at a police station shortly after the defendant's arrival there and while he was being held incommunicado his counsel insistently demanded to see the defendant but the demand was refused and the defendant was not informed of his counsel's presence, and that the last demand was communicated to the sergeant just before the defendant made the statement; it was without consequence that after having been given the constitutional warnings required by *Miranda* v. *Arizona*, 384 U. S. 436, and before making the statement the defendant had not asked to see his counsel. [325]

After a defendant in a criminal case has been given the warnings and signed a waiver respecting his constitutional rights under *Miranda* v. *Arizona*, 384 U. S. 436, adoption by police of tactics which effectively prevent or forestall the defendant's exercise of his right to assistance of counsel in connection with interrogation will render the warnings and waiver nugatory. [325–326]

It was error to admit in evidence at a murder trial a sketch or composite drawing of a man's face made by a police officer on the morning following the murder at the direction of a witness who had seen men near the scene of the murder on the day thereof. [326–327]

Evidence at the trial of indictments for murder in the first degree and robbery while armed of a victim found in his apartment bound, brutally beaten, stabbed and suffocated warranted verdicts of guilty against a defendant whose fingerprints were found on a drinking glass in the apartment and on a camera taken from the apartment and found two days after the murder in the victim's automobile. [327]

FIVE INDICTMENTS found and returned in the Superior Court on May 8, 1967.

Motions to suppress were heard by *Moynihan*, J., and the cases were tried before him.

*John C. Collins* for the defendant McKenna.

*Michael A. Molloy* (*John J. Riley* with him) for the defendant Riley.

*James F. Sullivan*, Assistant District Attorney, for the Commonwealth.

KIRK, J. The defendants Eugene G. McKenna and Michael E. Riley were each indicted for the murder of Jack Landau, and for robbery while armed with a dangerous weapon. Both were indicted for conspiracy to rob. The indictments were tried together subject to G. L. c. 278, §§ 33A–33G. Verdicts of guilty were returned on all indictments. The jury recommended that the death sentence not be imposed. The cases are here on appeals with assignments of error.

The trial, which commenced on January 15, 1968, and ended on January 24, 1968, showed the following: — About 6 P.M. on March 16, 1967, the body of Jack Landau, a television writer, producer and director, was found face downward in his apartment at 388 Beacon Street, Boston. His feet were bound together; his arms were tied tightly behind his back; his face and head had been brutally beaten; he had been stabbed in the back nine times. Four ligatures were tied so tightly around his neck as to shut off his breathing and the circulation of blood to his brain. The apartment, normally neat, was a shambles.

On the morning of March 15, 1967, about 3:30 A.M. three boys, eighteen to twenty years old, were seen. Two of them were standing on the curb directly opposite 388 Beacon Street. The third boy was coming out of 388 Beacon Street, on the steps of which there was a television set. The two boys on the curb crossed the street to join the boy who had come out of the apartment house. One of the boys looked like McKenna. Landau's automobile was found in Revere on March 17. It had been parked there since the forenoon of March 15. In the car was a camera taken from Landau's apartment. The camera bore Riley's fingerprint. In Landau's apartment a medicine bottle was found which bore the palm and fingerprints of McKenna.

In the bedroom of the apartment a drinking glass was found bearing the fingerprint of Riley. On March 25, 1967, a portable television set from Landau's apartment was found in Revere. Both defendants lived in Revere. Landau's death was certified to have occurred on or about March 15, 1967.

Several issues are raised by the appeals. The dominant issue is whether there was error in admitting in evidence statements made by the defendants to the police while in custody. The issue arises from the judge's denials of the defendants' motions to suppress the statements on the ground, that when made, the defendants were deprived of their constitutional right to the assistance of counsel. The judge made his decision at the conclusion of a voir dire which lasted several days. He thereafter filed "Findings of Fact and Rulings on Defendants' Motions to Suppress" in accordance with the practice set out in *Commonwealth* v. *Cook*, 351 Mass. 231, 233–234. The findings have been prepared with meticulous care. They are thorough in detail and comprehensive in scope. They occupy ten pages of the printed record.

We shall set out first some preliminary findings made by the judge; second, the subsidiary and ultimate findings on McKenna's motions; and third, the subsidiary and ultimate findings on Riley's motions.

## THE PRELIMINARY FINDINGS.

About 7:30 P.M. on March 16, 1967, following the discovery of Landau's body by a business associate, Sergeant Leo W. Gannon of the Boston police went to the apartment and assumed charge of the investigation. About 11 P.M. the same evening McKenna and Riley and a third person were arrested by Officer Chiccolo, also of the Boston police, in the vicinity of the Landau apartment on a charge of assault and battery and robbery of an elderly man. McKenna and Riley were not then suspected of complicity in the Landau murder. At the time of their arrest, the

arresting officer advised them not to say anything. On their arrival at the police station they were again advised prior to any questioning that they had a right to use the telephone, that they should not say anything until they saw a lawyer and "if they didn't have a lawyer the Commonwealth would get them a lawyer." They were fingerprinted. Each defendant made a telephone call and Riley's parents came to the police station as a result of his call.

On the night of March 17, 1967, McKenna was still in custody. At approximately 11:45 that night he was questioned about the Landau murder. Prior to any questioning he was advised of his rights by Sergeant John J. Doyle, who read to him from a paper a statement of his rights and then handed him the paper to read. McKenna read it and signed that part of the paper entitled "Waiver of Rights" which read: "I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me." In response to interrogation at that time McKenna made no statements other than to deny any knowledge of the Landau murder.

McKenna and Riley were arraigned in the Boston Municipal Court on the morning of Saturday, March 18, 1967, on charges other than those relating to the Landau murder. A probable cause hearing was held and both defendants were released on bail. At this hearing both defendants were represented by counsel. Mr. John C. Collins represented McKenna. Messrs. Michael A. Molloy and John J. Riley, an uncle of the defendant, represented Riley. No mention was made at this hearing of the Landau murder and Mr. Collins was not aware that McKenna had been questioned about that case. After the hearing both defendants returned to their homes in Revere.

On the afternoon of March 18, as the result of information which Sergeant Gannon received in the course of his inves-

tigation, he decided to arrest McKenna and Riley for the murder of Landau. On the evening of the same day, in company with Boston officers, Gannon went to the Revere police station.

### THE McKENNA FINDINGS.

Accompanied by officers from both departments Sergeant Gannon went first to McKenna's home, arriving about 6 P.M. McKenna was with his aunt and sister. Sergeant Gannon told McKenna that he was being arrested for the murder of Jack Landau. Sergeant Gannon then told McKenna that under the law he did not have to say anything or answer any questions; that whatever he said could be used against him in a court; that he was entitled to the services of an attorney; that if he could not afford one the Commonwealth would furnish him with one; that he was entitled to have an attorney present at any time he was questioned and at any time he could stop the questioning if he wished and have an attorney present. McKenna asked his aunt to call Mr. Collins. McKenna was then taken to the Revere police station. He was not questioned on the way to the station. He did not ask for a lawyer. Sergeant Gannon left McKenna's house in another car. Upon McKenna's arrival at the Revere police station he was booked on a charge of murdering Jack Landau. He was immediately informed of his right to use the telephone under G. L. c. 276, § 33A, as amended. He declined to use the telephone and signed an acknowledgment that he had been advised of his right to use the telephone. He was again advised of his rights to silence and to counsel. The so called *Miranda* warnings were read to him. McKenna did not at that time request that a lawyer be present at any interrogation. He was then placed in a cell.

A short time later McKenna was removed from the cell and brought into a room at the station. Shortly thereafter Sergeant Gannon, who in the interim had effected the arrest of Riley, returned to the station. McKenna was brought into another room of the station where Sergeant Gannon,

another Boston officer and two Revere officers were. Before interrogating McKenna, Sergeant Gannon again gave him the so called *Miranda* warnings. Sergeant Gannon asked McKenna if he understood and McKenna replied that he did. McKenna did not request a lawyer or the opportunity to talk to a lawyer. Sergeant Gannon then told McKenna that his fingerprints were found at the scene of the Landau crime. In response to questions from Sergeant Gannon, McKenna stated that he would tell "the story." McKenna then related the events leading up to the robbery and murder of Landau, describing the murder itself and his own participation in the robbery as well as that of the defendant Riley. His statement was in narrative form and was not simply a response to a series of questions by Sergeant Gannon. He related matters not previously known to the police. This interrogation of McKenna had begun between 6:45 and 6:50 P.M. and lasted in all about twenty-five or thirty minutes.

At some time during the questioning of McKenna, Mr. Collins, who minutes before had been informed over the telephone by McKenna's aunt that McKenna had been arrested for murder and was being taken to the Revere station, telephoned the Revere station and stated that he represented McKenna and had just been notified of his arrest. Lieutenant McDonough of the Revere police spoke to Mr. Collins on the telephone and told him that the matter was in the hands of the Boston police and that he would have to talk to Sergeant Gannon. At Mr. Collins's request Gannon was summoned to the telephone. Mr. Collins identified himself to Gannon, told him that he was counsel for McKenna, that McKenna had a right to have his lawyer with him before any interrogation and that he, Mr. Collins, would go to Revere or to any other place where the boy was to be taken for interrogation. Gannon told Mr. Collins that McKenna would be taken to Boston police headquarters. Mr. Collins understood from his conversation with Gannon that McKenna would be interrogated in Boston. Gannon did not tell Collins that the boy was then

under interrogation or that the interrogation would take place in Revere. Gannon was evasive in his statements to Mr. Collins. Mr. Collins immediately drove from his law office in Waltham, where he had made the call, to Boston police headquarters arriving shortly after 7:30 P.M. McKenna was not brought to Boston police headquarters until 9 P.M. or shortly thereafter. At that time Mr. Collins was permitted to confer privately with McKenna for as long as he wished.

McKenna was seventeen years old and appeared to be of average intelligence. He was educated in the public schools and left in the second year of high school. In determining the question of waiver the judge considered his youth. The judge concluded: "I find that at no time prior to his being interrogated or during the interrogation did McKenna request or indicate in any way that he desired to consult with counsel or to have counsel present during the interrogation. I find that he fully understood that he had a right to remain silent and to refuse to answer any questions put to him. He fully understood that he had a right to consult with his lawyer and to have his lawyer present when being questioned by the police. I find that the statements made by him at the Revere police station were made freely and voluntarily and without compulsion, coercion, threats or fear. No promises or inducements were made to him to persuade him to talk. I find that he freely chose to talk rather than to be silent, knowing that the choice was his to make. In summary, I find that he knowingly and intentionally waived his right to be silent and his right to the assistance of counsel at his interrogation."

### THE RILEY FINDINGS.

Riley was also arrested at his home on the evening of March 18, 1967, by Sergeant Gannon, who was accompanied by officers of the Revere police. The arrest was made about 6 P.M., shortly after the arrest of McKenna. Riley was told he was being arrested for the murder of Jack

Landau. Sergeant Gannon told Riley in his father's presence that he did not have to talk to the officers or answer any questions; that anything he said could be used against him; that he was entitled to have a lawyer present while being interrogated; that he was entitled to the services of an attorney and, if he could not afford one, one would be provided by the Commonwealth. Riley asked his father to "notify Uncle Jack." This was a reference to the defendant's uncle, Mr. John J. Riley. Riley's father telephoned Mr. Riley, who asked to be allowed to speak on the telephone with the defendant Riley. Sergeant Gannon refused this request. Riley did not ask to be allowed to speak to his uncle. Gannon told the father that the defendant was being taken to the Revere police station; the father told the defendant that "Uncle Jack" had said not to say anything.

Riley was taken to the Revere station and booked on the charge of murder at approximately 6:40 P.M. He was again advised of his right to remain silent and to have the services of counsel in substantially the same terms as before. Riley made no response. He was also told he had a right to use the telephone. He declined to use the telephone. He was then taken to a room in the station and detained while McKenna was being questioned by Sergeant Gannon. Riley was not questioned until after McKenna had made the inculpatory statement described above. When McKenna had completed his statement, Riley was brought into a room where McKenna was with Sergeant Gannon and the other officers. Sergeant Gannon again advised Riley of his rights. Riley made no response. Gannon then asked McKenna to relate the story he had just given. McKenna repeated his statement. Riley was then asked if he had anything to say. He made no immediate reply. At that point there was a knock at the door as Lieutenant McDonough sought admittance. Sergeant Gannon stepped outside and was informed that Riley's attorneys were there and wanted to see Riley. As Gannon stepped outside the room Riley stated to the other officers, "I just want you to understand

one thing." One of the officers thereupon went outside and told Gannon that Riley wanted to say something. Sergeant Gannon came back into the room and Riley stated, without any questions being put to him: "I just want you to know I wasn't in the room when the man was stabbed." Sergeant Gannon then took Riley to another room where he was allowed to talk with his attorneys. Riley was not further questioned.

Mr. John J. Riley and his associate Mr. Molloy had arrived at the Revere station about 7 P.M., approximately twenty minutes after Riley first arrived. The attorneys immediately made demands that they be allowed to confer with their client. Their request was transmitted to Sergeant Gannon and refused. They repeated their request to the Revere officers on duty at the desk on two more occasions. The third request was made at 7:25 P.M. At that time Riley was in the room with McKenna and the police officers. It was in response to this request that Lieutenant McDonough interrupted the interrogation with his knock on the door. Riley was eighteen years of age and of at least average intelligence. He was educated in the public schools, and left while in his senior year in high school.

The judge concluded: "I find that the interrogation of Riley was extremely brief. The single statement he made at the Revere Police Station was made in response to McKenna's story of the events surrounding the Landau murder rather than in response to interrogation by the police. Riley's statement was made freely and voluntarily. He was not compelled to make it. It was not made as a result of coercion or under any promise or inducement from the police. He was not abused or threatened in any way. I find that he fully understood the so-called Miranda warnings or advice given to him by Lieutenant McDonough and by Sergeant Gannon. At no time while at the Revere station did he request that he be allowed to consult an attorney. He understood that he was not required to answer any questions or to say anything and he understood that he had the right to have a lawyer present during any

interrogation. He chose to speak rather than to be silent. As in the case of McKenna, I find that Riley knowingly and intentionally waived his right to be silent and his right to the assistance of counsel at his interrogation."

The judge suppressed other statements made later by McKenna to the police in the presence of his mother but in the absence of counsel, Mr. Collins, at Boston police headquarters after midnight, i.e., at 12:10 March 19, 1967.

1. The subsidiary findings of the judge on the motions if strictly confined, on the one hand, to the warnings repeatedly given to McKenna and Riley by the police and, on the other hand, to the reactions of the defendants after the warnings, by silence, acquiescence, voluntary statements and failure to ask for counsel, might have justified his conclusion that each "knowingly and intentionally waived his right to be silent and his right to the assistance of counsel." Even this proposition is attended by doubt in view of the caveat: "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the Government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. *Escobedo* v. *Illinois*, 378 U. S. 478, 490, n. 14." *Miranda* v. *Arizona*, 384 U. S. 436, 475. Be that as it may, the judge's subsidiary findings are not limited to the words of warning which were communicated by the police to the defendants in literal compliance with the rules of the *Miranda* case and to the reactions of the defendants after the warnings. They include important additional facts which bring into focus another requirement of the *Miranda* rules which heretofore we have not been called upon to consider.

The *Miranda* case provides safeguards to the privilege against self-incrimination by requiring that explicit instructions be given to a person in custody on the right to the assistance of counsel. In brief, these safeguards require that the person who is in custody for interrogation must, first, be told of his right to be silent and his right to the

assistance of counsel; and, second, be afforded the opportunity to exercise these rights throughout the interrogation.[1] The second is as important as the first. The duty to do both is on the police, and, when challenged, the burden is on the prosecution to show that both have been done. The stated rights continue throughout the interrogation; they may be waived, but they cannot be forfeited.

With these considerations in mind, we hold that when Mr. Collins identified himself to Sergeant Gannon and invoked on McKenna's behalf his right to counsel and stated that he wanted to be with McKenna wherever the interrogation was to be held, it was Gannon's duty immediately so to inform McKenna. Sergeant Gannon's failure to do so denied rather than afforded McKenna the opportunity to exercise his right to counsel at that stage of the interrogation if in fact the interrogation had commenced. The legal consequence of the denial of the opportunity to reconsider whether he wanted counsel is that whatever "waiver" there may have been up to the time Mr. Collins made his request to Sergeant Gannon that he be present became then inoperative. Conceivably, McKenna might have chosen to go on with the interrogation. But he was entitled to know of his counsel's availability and, with that knowledge, to make the choice with intelligence and understanding. The obligation to inform McKenna was especially heavy since at the time of his arrest by Sergeant Gannon, he had asked his aunt to call Mr. Collins. Our conclusion is that, despite McKenna's signature on the "Waiver of Rights" signed the night before, which recited, "I do not want a lawyer at this time"; despite his nonacceptance of the use of the telephone; and despite the fact that he had

---

[1] "[U]nless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. *Opportunity to exercise these rights must be afforded to him throughout the interrogation*" (emphasis supplied). *Miranda v. Arizona,* 384 U. S. 436, 479.

not yet asked for a lawyer, the motions to suppress should have been allowed as to so much of the interrogation as took place after Mr. Collins talked to Lieutenant McDonough whose duty it was to convey, as he did, the message to Sergeant Gannon. Only that part of the interrogation is admissible which the prosecution proves to have taken place before the conversation between Mr. Collins and Lieutenant McDonough.

2. What we have said about McKenna's statement applies with equal force to Riley's. Sergeant Gannon knew that at the time of his arrest Riley wished to have his uncle notified, and that his uncle, when called on the telephone in Gannon's presence, wished to speak to Riley. His uncle and an associate arrived at the police station twenty minutes after Riley who in the interim was held incommunicado and had remained silent. His counsel insistently demanded that they see him. They had the right to see Riley and Riley had the right at once to know of their presence, even though after the *Miranda* warnings he had not asked to see them.[2] The "implied waiver" of his right to counsel did not survive the refusal of the police to admit counsel to him or their failure to inform him that counsel were present. The judge's findings establish that Riley's inculpatory statement was made after he had been denied the opportunity to exercise his right to the assistance of counsel. Riley's motions to suppress should have been allowed.

3. Other findings of the judge invite further comment. Although the police punctiliously adhered to the verbal formula of the *Miranda* decision in advising the defendants of their rights, they thereafter adopted tactics which effectively prevented or forestalled the exercise of the defendants' rights. "The requirement of warnings and waiver of rights is . . . not simply a preliminary ritual to existing methods of interrogation." *Miranda* v. *Arizona*, 384 U. S. 436, 476. Sergeant Gannon "was evasive in his statements" to Mr.

---

[2] "[A] valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." *Miranda* v. *Arizona*, 384 U. S. 436, 475.

Collins during the conversation on where the interrogation of McKenna would take place. The consequence of the evasiveness was that Mr. Collins was misled and went to Boston where, one hour and a half after his arrival, he learned that the interrogations had been concluded in Revere. This tactic prevented Mr. Collins from consulting with his client. "Independent of any other constitutional proscription, this action constitutes a violation of the Sixth Amendment right to the assistance of counsel and excludes any statement obtained in its wake." *Miranda* v. *Arizona*, 384 U. S. 436, 465–466, n. 35. See *People* v. *Arthur*, 22 N. Y. 2d 325.

4. Our discussion and holding on the McKenna statement to the police obviates lengthy discussion of *Bruton* v. *United States*, 391 U. S. 123, in which the Supreme Court of the United States held inadmissible at a joint trial the extrajudicial confession of a defendant which implicates a codefendant even though cautionary instructions are given to the jury to disregard the implication. The basis of the holding was that the admission of the confession was a violation of the codefendant's right of cross-examination under the Sixth Amendment. In *Roberts* v. *Russell*, 392 U. S. 293, the holding was made retroactive and applicable to the States. Accordingly, if in light of our earlier discussion any part of McKenna's statement should be determined to be admissible, consideration should be given to the advisability of ordering separate trials for the defendants.

5. Riley assigns as error the admission in evidence of a sketch or composite drawing of a face made by a police officer with the aid of a device called an "Identikit" at the direction of a witness (one Pfaff) who had seen the three young men near 388 Beacon Street in the early morning of March 15, 1967. The drawing was made the morning following the murder. At that time Riley had not been arrested. The drawing resembled Riley. Pfaff was shown the drawing at the trial and testified that it resembled one of the men he had seen on the morning of March 15. The drawing was passed among the jurors. When Pfaff was asked if anyone in the courtroom resembled one of the young men whom he

had seen on the morning of the murder, he indicated McKenna. We think there was error in admitting the drawing. It was at best a recording in graphic form of statements made by Pfaff to the police in the absence of the defendants. It could have been used to refresh Pfaff's recollection but it had no standing as evidence of the truth or accuracy of the matter contained in it.[3]

6. Finally, Riley contends that there was error in denying his motions for directed verdicts. The summary at the beginning of this opinion of the evidence gathered by the police and presented at the trial is sufficient refutation of this contention. The motions for directed verdicts were properly denied. We end this opinion with the observation that the speed and skill shown by the police in gathering evidence of a direct or circumstantial nature merit commendation. Where the evidence relied upon, however, consists of self-incriminating statements made by the accused while in custody under interrogation by the police, the procedures prescribed by the *Miranda* case must be observed in order that the statements be admissible. Those procedures have been developed, formulated, and promulgated by the Supreme Court of the United States, and have been given constitutional standing by that court. They are part of the law of the land and must be obeyed.

*Judgments reversed.*
*Verdicts set aside.*

---

[3] Such a drawing may have great value as a circular to aid in police investigations or to apprehend suspects but not as evidence in the context of the trial under review.