**Brian K. BURBINE,
Petitioner, Appellant,**

v.

**John MORAN, Respondent, Appellee.**

**No. 84–1554.**

United States Court of Appeals,
First Circuit.

Argued Nov. 6, 1984.
Decided Jan. 25, 1985.

Paula Rosin, Providence, R.I., for petitioner, appellant.

Anthony Delbonis, Sp. Asst. Atty. Gen., Providence, R.I., with whom Dennis J. Roberts, II, Atty. Gen., Providence, R.I., was on brief for respondent, appellee.

Before COFFIN and BOWNES, Circuit Judges, and WYZANSKI,* Senior District Judge.

COFFIN, Circuit Judge.

Petitioner Brian Burbine appeals the denial of his petition for a writ of habeas corpus. Burbine alleges that his Fifth, Sixth, and Fourteenth Amendment rights were violated by the failure of police to communicate to his attorney their plans to interrogate him and their failure to tell him that an attorney acting for him at the request of his sister had called to offer his services. Shortly after the call a written, inculpatory statement was obtained from him. This was followed by two others, all of which were used to convict him of murder. The District Court of Rhode Island held, *Burbine v. Moran*, 589 F.Supp. 1245 (D.R.I.1984), as did a Rhode Island Superior Court and the Supreme Court of Rhode Island, in a 3–2 decision, *State v. Burbine*, 451 A.2d 22 (1982), that Burbine's constitutional rights were not violated.

BACKGROUND

On the morning of March 3, 1977, Mary Jo Hickey was found unconscious in a parking lot in Providence, Rhode Island. Suffering from injuries to her head, apparently inflicted by a metal pipe found near the scene of the crime, she was hospitalized. Approximately three weeks later, she died.

On March 4, 1977, Burbine left Rhode Island to visit Nancy Jean Sanders James and her brother, Donald Sparks, in their home in Maine. During his stay Burbine told Nancy James that he had met Ms. Hickey in a bar in Providence on the evening of March 2, 1977, and had slapped her "a time or two" after they had driven to a parking lot and she had resisted his advances. Burbine told substantially the same story to Donald Sparks but added that there was some blood on Ms. Hickey when he left her and that he had washed blood from the interior of his automobile the next morning.

A few months later, at about 3:30 p.m. June 29, 1977, police in Cranston, Rhode Island, arrested and charged three men in connection with a breaking and entering. Burbine was one of them and Donald Sparks another. The third was a man named DiOrio. For purposes of interrogation, they were placed in separate rooms in the detectives' division in the basement of the Cranston police headquarters. It was learned that DiOrio and Burbine lived at

* Of the District of Massachusetts, sitting by designation.

306 New York Avenue. When Detective Ferranti of the Cranston police was informed of this fact, he recalled that he had been told two days earlier by a confidential informant that a man named "Butch" living at 306 New York Avenue was responsible for the death of Mary Jo Hickey. Between 5:00 and 6:00 p.m. Ferranti learned from DiOrio that Burbine was the only "Butch" living at that address. Detective Ferranti then went to the room where Burbine was being held. After Burbine confirmed that as far as he knew he was the only "Butch" residing at 306 New York Avenue, Ferranti informed him of his *Miranda* rights, but at this point Burbine refused to sign a waiver of rights form and refused to say anything further.

At about 6:00 p.m., after obtaining from DiOrio and Sparks statements implicating Burbine in the killing of Mary Jo Hickey, Ferranti called the Providence police to convey what he had discovered. At approximately 7:00 p.m., three officers of the Providence police, Detectives Bernard Gannon and Edward Trafford and their supervisor, Captain Wilson, arrived at the Cranston headquarters and went to the detective division, where they spoke first with Detective Ferranti and then with Sparks and DiOrio.

At approximately 7:45 p.m., Burbine's sister called the Office of the Public Defender to seek legal assistance for him. She asked for Assistant Public Defender Richard Casparian in particular and remarked that Burbine had missed an appointment with Casparian that afternoon, during which the two were to discuss an unrelated, pending charge against Burbine. As soon as Burbine's sister hung up, the person who took her call tried to reach Casparian. Once it was determined that he was unavailable, Allegra Munson, another Assistant Public Defender, was contacted and informed of the situation.

What transpired next is probably best summarized in the words of the Supreme Court of Rhode Island.

"At approximately 8:15 p.m., Ms. Munson called the Cranston police station and asked that her call be transferred to the detective division. A male voice responded with the word "Detectives." Ms. Munson identified herself and asked if Brian Burbine was being held; the person responded affirmatively. Ms. Munson explained to the person that Burbine was represented by attorney Casparian who was not available; she further stated that she would act as Burbine's legal counsel in the event that the police intended to place him in a lineup or question him. The unidentified person told Ms. Munson that the police would not be questioning Burbine or putting him in a lineup and that they were through with him for the night. Ms. Munson was not informed that the Providence police were at the Cranston police station or that Burbine was a suspect in Mary's murder." *State v. Burbine*, 451 A.2d at 23–24.

Who at the headquarters was speaking to Ms. Munson has never been determined. All of the identified officers denied receiving or knowing about the call. Burbine was never told of Munson's call, her offer of assistance, or the information that was given her.

At approximately 9:00 p.m., Burbine was brought to the main room in the detective division where Ferranti and his immediate superior, Lieutenant Ricard, and the three Providence officers had gathered. After being advised of his rights, he was asked about the Hickey killing and, appearing "fidgety", denied involvement. He was then returned to the smaller room. About ten minutes later, Ferranti heard repeated banging on the door of that room and went to speak with Burbine. He was crying and said he was "disgusted", "sorry", and wanted to make a statement. Ferranti went to get two of the Providence officers, Detectives Gannon and Trafford, and the three of them brought Burbine to the main office to take a statement. The detectives then read Burbine his *Miranda* rights, ascertained that he understood what his rights were, and at about 9:30 p.m. obtained his signature on a waiver-of-rights

form.[1] He was later described as having been "shaky, in tears", but as having spoken clearly. For the next fifty minutes Detective Gannon conducted the interrogation, typing his questions and Burbine's answers. At 10:20 p.m., Burbine signed a typed, four-page, inculpatory statement and Detective Ferranti "notarized" it.

Burbine was then returned to the smaller room and given food. Sometime between approximately 10:45 p.m. and 11:00 p.m., he said he had omitted some information and was returned to the main room. He was again read his *Miranda* rights and gave a second statement. This one was signed at 11:20 p.m.

Finally, at approximately noon the following day, June 30, 1977, having been taken to the Providence headquarters, Burbine gave a third inculpatory statement, this time to Detective Trafford. At 12:05 p.m., while this final statement was being taken, Trafford's superior, Major John Leyden, called the Office of the Public Defender to request the presence of an attorney for an identification lineup that was to follow. Later that day, Assistant Public Defender Casparian came to the Providence headquarters and assisted Burbine during the lineup.

At the subsequent hearing on Burbine's motion to suppress his three written statements, the Superior Court found that Ms. Munson did make the phone call, as described above, but also "that there was no collusion or conspiracy on the part of the police 'to secrete [Burbine] from his attorney....'" *State v. Burbine*, 451 A.2d at 24. It also found that Burbine was not threatened, coerced, or promised any benefits in exchange for his statements and that Burbine had "knowingly, intelligently and voluntarily waived" his right to counsel and his privilege against self-incrimination. *Id.* In accordance with these findings, the court denied Burbine's motion to suppress. Burbine was subsequently convicted of first degree murder on the basis of his three statements and the testimony of Nancy James, Donald Sparks, and other witnesses.

Burbine appealed the denial of his suppression motion to the Supreme Court of Rhode Island, which affirmed the lower court's decision by a 3-to-2 vote. Burbine then petitioned the United States District Court of Rhode Island for a writ of habeas corpus, alleging Fifth, Sixth, and Fourteenth Amendment violations. The district court reviewed the record of the state proceedings and denied the petition. On appeal, Burbine challenges the district court's conclusions on all three claims.

ANALYSIS

A natural starting point for us is *Fuentes v. Moran*, 733 F.2d 176 (1st Cir. 1984), where we dealt with another case of the securing of inculpatory statements from a suspect in custody after an attorney had called the police station. In that case we found no violation of constitutional rights.

The facts there were as follows. Two days before Fuentes gave his inculpatory statements, the police called an attorney known to have represented Fuentes in past matters and asked the attorney Fuentes' whereabouts so that he might be questioned about the disappearance of two sisters. The police said that he was not a suspect but was wanted for questioning. One day later, he was arrested pursuant to a bench warrant for failure to pay an unrelated fine. The next day officers discovered the bodies of the sisters and called the police station to see if Fuentes was still in custody and discovered that he was. Shortly thereafter, and before the critical interrogation concerning the two women began, Fuentes' attorney called, ascertained that Fuentes was in custody, asked how Fuentes' release could be obtained, and was told that the two officers who could answer that question (including the one who had told the attorney that he wanted to question Fuentes about the dis-

---

1. Although Burbine's testimony differed sharply from that of the police as to whether he waived his rights and as to other aspects of the interrogation, the Superior Court found the police's version to be more credible.

appearance of the two sisters) were not in at the moment. The attorney asked no more questions and made no requests of the police officer to whom he was speaking. Instead, he chose to attend to other business and did not call back to check with the police for four hours. When he did, he learned that Fuentes had confessed during an interrogation that began when the two investigating officers returned to the station, which was approximately thirty minutes after the attorney had last called. *Id.* at 178–79.

In rejecting Fuentes' Sixth Amendment claim,[2] we held that the first call, in which the police had said Fuentes was not a suspect, was neither "an attempt to deceive, [nor] deceiving". *Id.* at 180. The content and context of that phone conversation had been such that both the attorney and the police knew that the attorney had all the information necessary to assess his client's predicament. As for the second telephone conversation between the attorney and the police, we acknowledged the possibility that there had been some dissimulation on the part of the police but "on balance" rejected "the contention that the failure to fully inform [the attorney] was a harmful deception." *Id.* We noted, moreover, that counsel's failure to take any action whatsoever in his client's interests for four hours "undermine[d] any claim that the police had an obligation to keep him fully informed." *Id.*

In rejecting Fuentes' Fifth Amendment claim that his *Miranda* rights had been violated by the failure of the police to inform him of his attorney's phone call, we held that, since Fuentes had an "ongoing professional relationship" with his attorney, merely failing to say that the attorney had "made a half-hearted inquiry as to Fuentes' status ... [did] not warrant the label 'trickery' and [did] not vitiate Fuentes's fifth amendment waiver." *Id.* at 181. Were Fuentes to have been told of

this call and that there had been no subsequent effort by his attorney to call either of the two officers named, it is perhaps not unfair to speculate that more despair than confidence would have been generated.

Nevertheless, we concluded our Fifth Amendment analysis in *Fuentes* with the warning that "some of the questions or contrary inferences we have noted indicate how careful law enforcement officials must be in dealing with suspects and lawyers during the investigatory phase of a prosecution." *Id.* We therefore think it useful to match the critical factors in the case at bar with those in *Fuentes,* to see whether this case falls within or without the proper scope of that decision.

We begin by noting that the district court appropriately recognized that

Burbine's case is ... a more compelling one than Fuentes', on almost every score. His educational background and attainment appeared considerably less imposing, his experience with the criminal justice system, while appreciable, was not so wide and varied, his behavior from and after the time of apprehension was a trifle less decisive, and the actions of the constabulary can be viewed as having sailed a little closer to the wind." *Burbine v. Moran,* 589 F.Supp. at 1252–53. Our task in this review is to ascertain as accurately as we are able whether this case is sufficiently more compelling than Fuentes' so as to make a legal difference.

■ We are dealing with the primary Fifth Amendment privilege against self-incrimination and the ancillary, supportive "right to consult with counsel prior to questioning ... [and] also to have counsel present during any questioning if the defendant so desires." *Miranda v. Arizona,* 384 U.S. 436, 470, 86 S.Ct. 1602, 1625, 16 L.Ed.2d 694 (1966). The critical legal question is: there having been interrogations of petitioner in the absence of counsel, did

---

**2.** Although in this case we consider only Burbine's Fifth Amendment claim, our observations in *Fuentes* with respect to Fuentes' Sixth Amendment claim are relevant here. They bear directly upon the significance, or insignificance, of

the withheld information and upon the presence, or absence, of "any evidence that the accused was ... tricked...." *Miranda v. Arizona,* 384 U.S. 436, 476, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966).

petitioner waive his right to consult with counsel during those interrogations? In establishing waiver, the government bears the "heavy burden" of demonstrating "that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel."[3] *Id.* at 475, 86 S.Ct. at 1628. "Moreover, any evidence that the accused was ... tricked ... into waiver will, of course, show that the defendant did not voluntarily waive his privilege." *Id.* at 476, 86 S.Ct. at 1628.

We also note that, our analysis at this juncture being wholly focused on petitioner's Fifth Amendment rights, not his Sixth Amendment right to counsel, the question is not how badly counsel was misled, but the effect of any misrepresentations on the knowingness and voluntariness of petitioner's waiver of his privilege against self-incrimination and his right to consult counsel thereon. In determining whether his waiver was valid, we are to assess " 'the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused.' " *North Carolina v. Butler,* 441 U.S. 369, 374–75, 99 S.Ct. 1755, 1757–58, 60 L.Ed.2d 286 (1979)—(quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)).

We begin with the obvious facts that on June 29, the police informed Burbine of his rights on no fewer than three occasions and twice secured his verbal acquiescence and a sworn-to signature. A similar process took place on June 30. These facts and the fact that Burbine knew that Attorney Casparian and the Public Defender's office were available to him weigh in favor of the validity of the waiver. But they must be viewed in the total context to determine whether the state can be held to have successfully borne its "heavy burden".

We therefore proceed to identify and weigh the remaining factors. We begin with Burbine's educational background, his experience with the criminal justice process, and his conduct during the proceedings. These three factors, as the district court noted, are all more favorable to Burbine than they were to Fuentes. Burbine was 21 with only a fifth grade education; Fuentes had attended Rhode Island Junior College, *Fuentes v. Moran,* 733 F.2d at 181. Although Burbine was currently involved in one criminal matter in which Attorney Casparian was yet to be consulted, as well as the breaking and entering charge on which he had just been arrested, these did not equal the prior exposure of Fuentes. *Id.* As for Burbine's observable behavior, his initial "fidgety" refusal to sign a waiver-of-rights form, his dramatic

**3.** We note that although the existence of an attorney-client relationship is not an issue that is before us, having played no part in the parties' briefing or in the district court's decision, it was a major focus in the various opinions of the Justices of the Rhode Island Supreme Court. The majority's conclusion that there was no attorney-client relationship was an important element of its view that failure to reveal the fact of Attorney Munson's call to Burbine would not have "added significantly to the quantum of information necessary for the accused to make an informed decision as to waiver." *State v. Burbine,* 451 A.2d at 29.

On this question we would agree with the Massachusetts Supreme Judicial Court that "it would unduly elevate form over substance" to hold there was no constitutional significance to a police officer's failure to inform an accused of a call from a public defender staff attorney simply because she "had not yet been appointed to represent the defendant in the instant case."

*Commonwealth v. Sherman,* 389 Mass. 287, 450 N.E.2d 566, 570 (1983). Here, Burbine had an "ongoing professional relationship with the public defender's office." *Burbine v. Moran,* 589 F.Supp. at 1252. Assistant Public Defender Casparian was already representing him in one matter when his sister called for legal assistance with respect to his arrest and detention on June 29. As Justice Kelleher noted, "the Providence police had no difficulty accepting the public defender as Burbine's duly authorized counsel even though no referral had been made by the Superior Court relating to the homicide case ...." *State v. Burbine,* 451 A.2d at 40 (Kelleher, J., dissenting). An attorney-client relationship existed in these circumstances just as surely as one existed in *Fuentes,* where the defendant had retained counsel. To conclude otherwise would be to aid in the creation of "a dual system of justice—one for indigent persons and one for persons fortunate enough to afford private counsel." *Id.*

change of position in the ten minutes between denying involvement and tearfully volunteering to confess were factors not to be found in *Fuentes.*

Still, these differences, while they serve to distance the case at bar from *Fuentes,* do not by themselves carry much weight. This is not the kind of Fifth Amendment case in which direct physical or psychological pressure from the police is claimed to have overborne the will of a suspect. In such a case the factors we have briefly analyzed would have more importance. In the instant case, as in *Fuentes,* however, we must assess, in addition, the extent to which a refusal to inform a suspect of the availability of specific counsel can be said to infect an otherwise valid waiver. The two factors we deemed crucial in *Fuentes* were the fact that what was withheld from the suspect was information of a "half-hearted", feckless effort to be of service and the fact that the failure to inform the suspect did not sink to the level of trickery or withholding of vital information.

■ In the case at bar, we have an entirely different situation. Attorney Munson could not be criticized for lack of diligence. Not a novice, she had been in the Office of the Public Defender for six years and had represented over a thousand persons charged with crime. Her call was not routine, but rather took place well after office hours, in mid-evening. When the police operator answered, Munson asked to be transferred to the detective division, which was done. She then inquired whether Sparks and Burbine were being held in custody. On receiving an affirmative answer, she said Burbine was represented by her co-worker Casparian, on whose behalf she was calling. She asked whether the detectives intended either to put Burbine in a lineup or to question him and added that if they did, she would make herself available. Then, according to her testimony, "[t]he officer said [Burbine] was not going to be questioned or put in a lineup, and that they were through with him for the night...." At this point, she had good reason to believe that her mission had been accomplished.

When we come to assess the effect of this phone call on Burbine and the voluntariness of his waiver of counsel during his subsequent interrogations, we take into account three factors: the withholding from Burbine of the fact that Attorney Munson had called; the withholding of the fact that Munson had been told there would be no questioning or lineup that night; and the conduct of the police in effecting the withholding.

Both the district court and the Rhode Island Supreme Court considered only the first factor, the effect of withholding the fact that Munson had called. As the state court put it, "It hardly seems conceivable that the additional information that an attorney whom [the accused] did not know had called the police station would have added significantly to the quantum of information necessary for the accused to make an informed decision as to waiver." *State v. Burbine,* 451 A.2d at 29. This seems to us to be an unrealistically narrow focus—to have told Burbine merely that an attorney from the Office of the Public Defender had called would have been to tell half the story, or less. Such information might have had only marginal significance for Burbine. But to have added that the attorney had said she would make herself available that night if police wanted to question him and that the attorney had been told that they were "through with him for the night" would have conveyed a dramatically different message. In the first place it would have told Burbine that the attorney had not made further efforts to see him only because she had been assured that there would be no more questioning that night. In other words, Attorney Munson's efforts would not have appeared half-hearted to him. In the second place, when Detectives Gannon and Trafford sought to interrogate him at 9:00 p.m., Burbine would have known that they were trying to change the ground rules that had just been given Attorney Munson. Instead of first denying all involvement, while appearing "fidgety", then doing a sudden about-face

by expressing disgust with himself, crying, and volunteering to confess, he might very well have decided to hold his interrogators to their word as it had been expressed to Munson.

In this regard, we can do no better than repeat Justice Linde's statement, "To pass up an abstract offer to call some unknown lawyer is very different from refusing to talk with an identified attorney actually available to provide at least initial assistance and advice, whatever might be arranged in the long run. A suspect indifferent to the first offer may well react quite differently to the second." *State v. Haynes*, 288 Or. 59, 72, 602 P.2d 272, 278 (1979), *cert. denied*, 446 U.S. 945, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980).[4] But perhaps speculation is in these circumstances idle. As Justice Linde concluded his opinion for the court: "When the opportunity to consult counsel is in fact frustrated, there is no room for speculation what defendant might or might not have chosen to do after he had that opportunity." *Id.* at 75, 602 P.2d at 280.

In addition to withholding from Burbine the fact that Munson had called, expressing a desire to be present at any questioning, and the further fact that Munson had been told that no further questioning was planned that evening, we also consider whether or not there was trickery or other blameworthy action by the police. In this case we see no other explanation for the refusal to tell Burbine of Attorney Munson's call than the deliberate or reckless irresponsibility of the person who responded to Attorney Munson's call.

In so holding, we do not take issue with the findings of the Superior Court, as far as they go. The court heard contradictory testimony on the matter of the phone call. Ms. Munson testified that she made the call described above. Each of the two Providence police detectives testified that he nei-ther received a call from her nor heard anyone else talking about one. The state emphasized in its testimony that the switchboard would have transferred the call only to Detective Ferranti or Lieutenant Ricard downstairs in the detective division or to the officer in charge of the Cranston station at the time, Captain Del Monico; yet, all of these individuals denied ever receiving or hearing about Ms. Munson's call. The main thrust of the state's case, therefore, was that Ms. Munson had to be lying. The superior court disagreed in part with both sides, finding that Ms. Munson did make the call but also that there was no conspiracy or collusion among the police to mislead either her or Burbine.

Our problem is not that the finding of lack of collusion or conspiracy is unsupported, but that it does not cover the other relevant possible police responses. The first such possibility is that the officer who responded to Munson did so deliberately but without conspiring with anyone. This, of course, would not render the response any less blameworthy or provide the police as a group with a justification for not having fully informed Burbine about the call. *Cf. United States v. Downing*, 665 F.2d 404, 405–07 (1st Cir.1981) (*Miranda* violation found even though officer conducting second part of interrogation was unaware that suspect had previously told another officer that he wanted to consult an attorney).

A second possibility is that set forth by the Rhode Island Supreme Court and accepted by the district court, i.e., that the apparent incongruity of the findings could be explained by the fact that the Cranston police were investigating one crime, the breaking and entering, while the Providence police were investigating another, the murder of Mary Jo Hickey, and that the recipient of Ms. Munson's call was

---

4. We note that, although the *Haynes* court used the words "actually available", it was not referring to counsel's literal knocking on the door of the police station, but rather his first "telephone call informing the ... police that he had been asked to represent defendant and was coming to the police station to see him...." *Id.* at 74, 602 P.2d at 279. Of course Attorney Munson's call has the same significance, since her immediate visit was frustrated by the misinformation given her.

merely referring to the former. *State v. Burbine*, 451 A.2d at 29–30 n. 5.

The problem with this explanation is that it is based on assumptions unsupported by the record. As the police officers' own testimony clearly shows, the two police departments were working hand in hand, in close quarters, concentrating first on DiOrio and Sparks, gathering information to be used in the interrogation of Burbine. Detective Ferranti of the Cranston station was with Burbine and Providence Detectives Gannon and Trafford throughout the evening and played an active role by talking to Burbine several times. Captain Wilson, the senior Providence officer present, exercised general supervision for five hours while the questioning took place in separate rooms. Ferranti's superior, Lieutenant Ricard, was also present and was in and out of Burbine's interrogation room several times. The only other person, according to the police, who could have taken the phone call, Captain Del Monico, stated that he had never received such a call, that if one had been made it would have initially been routed to the detective division, where Ricard and Ferranti were the only two Cranston detectives present, and that, if by error it had been routed to the Captain, he certainly would have transferred it to the detective division. Under these circumstances, the evidence that a Cranston officer answered Munson's call and innocently referred solely to the investigation of the breaking and entering incident falls far short of the substantiality required to meet the state's burden.

The state, in its brief on this appeal, suggests a third possibility—that the record permits an inference that other Cranston personnel were present, perhaps some who had been working on the earlier shift, which apparently ended at 7 p.m., or a third Cranston detective working on an entirely different murder investigation. There are several problems with these speculations. First, the critical time was about 8:15 p.m., over an hour after the change of shifts. Second, there is no positive testimony that any unidentified personnel were present in what appears from the evidence as an open central room with several telephones. Third, the state's sole line of argument before the Superior Court was not that some person other than the officers known to have been involved with Burbine answered Munson's call, but that there was no such call. Fourth, and most important, is the fact that even if the speculation about additional, unnoticed personnel being present were accepted as proven (despite the "heavy burden" borne by the state), there simply was not an acceptable justification for the answer given Attorney Munson. If such a person, knowing of the attorney's desire to be present at any lineup or questioning, had indeed responded, without hesitation and without checking with others, that the police were through with Burbine for the evening, his response would at the very least have been inexcusably reckless.

We have tried to be both punctilious and fair in our analysis of the circumstances of Attorney Munson's call and its reception by the Cranston Detectives Division, because close cases may be decided by only a few critical facts. *Fuentes* was a close case, narrowly favoring the state. The case at bar, we feel, crosses the line.

In so holding, and thus disagreeing with both the district court and a respected state court, we join ranks with a number of other respected courts, indeed apparently all the other state supreme courts that have considered the issue. In all of those cases, like the one at bar, *Miranda* warnings were duly given, damaging admissions were made, and there was no hint of threats or physical coercion. And in all of those cases the courts held that the failure to inform a suspect in custody that his attorney or an attorney retained for him was seeking to see him vitiated his waiver of his Fifth Amendment right to assistance of counsel at his questioning.

Through all the cases runs a pattern of evasion or dissimulation similar to the facts in this case. *State v. Haynes*, 288 Or. at 62, 602 P.2d at 273 (evasive answer given attorney: "[W]e know nothing about it.");

*Weber v. State,* 457 A.2d 674, 684–86 (Del. 1983) (counsel and suspect's father waited at police station almost four hours; police interrogated suspect without communicating information about counsel; held, plain error); *Commonwealth v. Sherman,* 389 Mass. 287, 450 N.E.2d 566, 567 (1983) (request from attorney to be present at questioning not communicated to suspect even though his interrogation took place soon thereafter); *Commonwealth v. McKenna,* 355 Mass. 313, 324, 244 N.E.2d 560, 566 (1969) (police failed to tell suspect that attorney wanted to be with him during questioning); *People v. Smith,* 93 Ill.2d 179, 183, 189, 66 Ill.Dec. 412, 413–414, 442 N.E.2d 1325, 1326–27, 1330 (1982) (police lied to attorney, saying suspect was undergoing heroin withdrawal; although police did give suspect attorney's card, court held that mere receipt of card could have led suspect to feel attorney was "too busy" to consult); *Commonwealth v. Hilliard,* 471 Pa. 318, 321, 370 A.2d 322, 323 (1977) (police denied having custody of suspect); *State v. Jackson,* 303 So.2d 734, 735–36 (La.1974) (officials interrogated accused without informing her that retained counsel had called asking that she not be questioned until he conferred with her).

The variations revealed by this catalogue of authorities illustrate the constitutional policy served by these decisions and amply support our limited ruling. Deliberate or reckless misleading of an attorney, who has a legitimate, professionally ethical interest in a suspect in custody and who expresses to the police a desire to be present at any interrogation of the suspect, combined with a police failure to communicate that exchange to the suspect, is more than just one factor in the calculus of waiver. This combination of circumstances clearly vitiates any claim that a waiver of counsel was knowing and voluntary. Were this not so, the proper role of a defense counsel would be meanly diminished. If police officers with a more than warm suspect in their custody were permitted to engage in frustrating dissimulation with

impunity, they would have to be more than human to resist the temptation to mislead the suspect and his counsel.

We stress that our ruling is limited. We do not subscribe to the New York rule, based on that state's constitution, that a suspect may never waive his privilege against self-incrimination in the absence of his attorney. *People v. Hobson,* 39 N.Y.2d 479, 481, 348 N.E.2d 894, 896, 384 N.Y.S.2d 419, 420 (1976). We also acknowledge that "a person in custody may … speak if he so chooses, and without a lawyer's advice. The crucial point is that it must be a knowing choice as well as voluntary in the sense of not being coerced." *State v. Haynes,* 288 Or. at 72, 602 P.2d at 278. We would note in addition that our holding is restricted to an attorney having at least as much continuing relationship to the client and his family as we found in *Fuentes* and find in this case. Accordingly, we do not foresee any real danger of an influx of volunteering attorneys with no past or present relationship to the client. And, finally, our holding is restricted to a situation where the failure to communicate by the police can only be characterized at the minimum as reckless. What would be the result of a merely negligent failure to communicate we leave for another day. *Compare Weber v. State,* 457 A.2d at 686 (negligent failure to inform suspect is sufficient to vitiate waiver); *Commonwealth v. Hilliard,* 417 Pa. at 323, 370 A.2d at 324 (violation would occur even if suspect was denied counsel as result of "honest mistake" by police).

In conclusion, we find that Burbine's Fifth Amendment right to counsel and privilege against self-incrimination were violated and that all three of the inculpatory statements that he made while in custody should have been suppressed.[5] No one has argued that admission of these statements did not affect the outcome of his case. Although the jury heard other evidence, there can be little doubt that these statements were critical in obtaining Burbine's

5.  So finding, we do not reach petitioner's Sixth and Fourteenth Amendment claims.

conviction. Accordingly, a new trial is required.

*The judgment of the district court is reversed. A writ of habeas corpus is to be issued and petitioner released within 60 days of our mandate unless the state of Rhode Island has vacated the judgment of conviction and scheduled an early retrial.*