Michael REICHERT *v.* STATE of Arkansas

CA CR 85-51                                          695 S.W.2d 845

Court of Appeals of Arkansas
Division II
Opinion delivered September 11, 1985

*William R. Simpson, Jr.*, Public Defender, by: *Arthur L. Allen*, Deputy Public Defender, for appellant.

*Steve Clark*, Att'y Gen., by: *Mary Beth Sudduth*, Asst. Att'y Gen., for appellee.

LAWSON CLONINGER, Judge. Michael Andrew Reichert was found guilty by a jury of murder in the first degree in violation of Ark. Stat. Ann. § 41-1502 (Repl. 1977), and was sentenced to fifteen (15) years imprisonment. He appeals, arguing that he was denied his right to counsel at the time he made an inculpatory statement to the police and thus that his motion to suppress the

statement should have been granted and the statement excluded from evidence. We think the court correctly denied appellant's motion to suppress and we affirm.

The victim of the murder for which appellant was convicted was his mother, Mary Ann Murry, who died of gunshot wounds on the afternoon of January 27,1984. After discovering that Mrs. Murry had been killed, the police took appellant and other family members and friends of the family to the police station for questioning. Lieutenant Keith Rounsavall testified that he transported appellant from the crime scene to the police station where they arrived at about twelve o'clock midnight. At that time, Rounsavall said, appellant was not a suspect and was not under arrest but was just needed to answer some questions.

Detective Dwight McBrayer testified that he and Detective Ronnie Smith advised appellant of his constitutional rights and that they witnessed appellant signing a standard rights form. McBrayer said that appellant appeared calm, cool and collected, that he did not appear intoxicated, that he indicated that he could read and write, and that he understood his rights and the rights form. The form was signed at 1:00 a.m., according to McBrayer, and he testified that neither he nor Detective Smith used threats or violence to induce appellant to sign the rights form. A half-hour discussion then ensued between appellant and the detectives after which Detective Smith began writing out the first statement made by the appellant. McBrayer said that Smith finished writing the statement at 2:25 a.m.

Detective McBrayer's testimony concerning the meeting between him and appellant was corroborated by Detective Smith's testimony. Smith further testified that after appellant signed the first statement, he (Smith) left the room and met with a Detective Ivan Jones and Detective Richard Fulks and that they discussed certain inconsistencies in the statement for approximately fifteen to twenty minutes. He stated that Detective Jones then went back into the room where appellant was at about 2:45 a.m.

Detective Fulks testified that he and Detective Jones went in to talk to appellant at about 2:35 a.m. He also testified that appellant did not appear to be intoxicated at that time, that appellant indicated that he still understood his rights and that no

violence or threats were used against appellant. Fulks stated that after Detective Jones pointed out the inconsistencies in appellant's statement, appellant began talking about various problems he had, some of which concerned his mother. According to Fulks, they readvised appellant of his rights and began taking a second statement at 3:15 a.m. in which appellant admitted that he killed his mother. They finished taking the statement at about 3:30 a.m. and the statement was then signed by appellant.

Detective Fulks' testimony was corroborated by Detective Jones' testimony as to the events that occurred when he and Fulks took appellant's second statement. Jones also testified that Detective Rounsavall advised him and appellant at about 4:00 a.m. that an attorney was there to see appellant but that appellant indicated that he did not want to talk to anyone.

Detective Rounsavall took the stand again and testified about his contact with Faber Jenkins, the attorney who asked to see appellant. Rounsavall testified that he first saw Jenkins at 3:40 a.m. when Jenkins approached him at the police station and said he had been hired to represent appellant by a friend of the family. Rounsavall testified that the Little Rock Police Department has an unwritten policy not to allow an attorney to see a prisoner unless the prisoner or a member of his family has requested it. He explained this policy to Jenkins and later he received a telephone call from appellant's sisters asking that Jenkins be allowed to see appellant. Rounsavall said this occurred at 4:00 a.m. and he then informed appellant that Jenkins was at the station but appellant refused to see him.

Much of the testimony presented by the defense is in direct conflict with the testimony of the police officers. Several of appellant's friends and acquaintances testified that they witnessed appellant drinking heavily on the night of January 27. Other persons testified that they saw appellant on that night and that he smelled of alcohol and appeared to be intoxicated.

Faber Jenkins testified that he was called by appellant's neighbor to go to the station at about 2:00 a.m. He stated that he arrived at the station and first spoke to Rounsavall sometime between 2:00 a.m. and 3:00 a.m. After being told that he could not see appellant, Jenkins talked to the caller who had contacted him and asked for the names of appellant's two sisters. He said he then

called the chief of police who expressed his confidence in the judgment of his officers and advised Jenkins to go talk to Rounsavall again. This conversation took place about 3:45 a.m., according to Jenkins. He said Rounsavall again denied him access to appellant but finally he left at 4:20 a.m. and returned to say that appellant did not want a lawyer. Jenkins said that he then requested that a breath alcohol test be done on appellant.

Appellant testified that he had been drinking heavily on January 27 and was definitely intoxicated. He stated that at the time he signed the rights form, he had not been threatened but that he signed the second statement because he had been threatened by a police officer who was questioning him. Appellant said he would have talked to Jenkins if he had known Jenkins was available before he began talking to Detective Jones. He admitted that he did not request to speak to an attorney that night.

On appeal, appellant argues that the trial court erred in finding that his waiver of counsel was voluntary, because he had not been informed of Jenkins' availability. He states that in order to maintain his constitutional rights, the police should have had a procedure to ensure that Jenkins could have communicated with appellant without unreasonable delay. Appellant cites cases from other jurisdictions which support his argument because he points out that this issue is one of first impression in Arkansas. *See Massachusetts* v. *McKenna*, 355 Mass. 313, 244 N.E.2d 560 (1969); *Lewis* v. *Oklahoma*, 695 P.2d 528 (Okla. Crim. App. 1984); *Oregon* v. *Haynes*, 288 Or. 59, 602 P.2d 272 (1979), *cert. denied*, 446 U.S. 945 (1980).

The State argues that appellant knowingly and voluntarily waived his rights under the totality of the circumstances in this case. The State points out that appellant had ample opportunity to request an attorney and yet did not do so.

We agree with the State. Several police officers testified that appellant did not appear intoxicated and that he was advised and readvised of his rights. Appellant agreed that he did not request an attorney. The only testimony that threats were used against appellant was given by appellant himself.

Mr. Jenkins appeared at appellant's plea and arraignment in municipal court, but was subsequently informed by appellant

that he did not want Mr. Jenkins to represent him. Mr. Jenkins was not paid a fee by anyone. The facts do not support a finding of an attorney-client relationship between appellant and Jenkins.

In the cases cited by appellant the general rule was stated that a person being interrogated must be advised that his attorney has requested to see him. In all those cases, however, the attorney had been requested by the person being interrogated or by a member of his family. In *Oregon* v. *Haynes, supra*, the attorney was obtained by the suspect's wife. In *Massachusetts* v. *McKenna, supra*, the suspect, in the presence of a police officer, asked his aunt to call his attorney, who was also his uncle. There was also evidence that the attorney had been directed to the wrong police station. In *Lewis* v. *Oklahoma, supra*, the police officers failed to admit counsel retained by the suspect's parents and failed to inform the suspect that his attorney was endeavoring to see him.

In the instant case, the evidence supports a finding that appellant was told of Mr. Jenkins' presence as soon as Officer Rounsavall was aware of appellant's sisters' consent. Appellant's inculpatory statement was begun at 3:15 a.m. and concluded at approximately 3:30 a.m. Officer Rounsavall testified that he first saw Mr. Jenkins at 3:40 a.m. and that he then had a call from appellant's sisters, whereupon appellant declined to see Mr. Jenkins. There is no evidence of deceit or misconduct upon the part of the police officers, and their conduct was reasonable under the circumstances. While it is true that Jenkins testified that he spoke to Rounsavall earlier than 3:40, we must leave the resolution of these conflicts in testimony to the trial court. *Marbley* v. *State*, 9 Ark. App. 190, 656 S.W.2d 717 (1983); *Neal* v. *State*, 4 Ark. App. 357, 631 S.W.2d 313 (1982).

We have examined all of the testimony in the light most favorable to the State and have resolved all conflicts in favor of the State as is the standard of review in this court. As a result, we find that under the totality of the circumstances, the trial court's finding of voluntariness is not clearly against the preponderance of the evidence or clearly erroneous.

Affirmed.

COOPER and CORBIN, JJ., agree.