338 S.E.2d 188

**STATE of West Virginia**

v.

**Antoine B. HICKMAN.**

**No. 16305.**

Supreme Court of Appeals of West Virginia.

Dec. 12, 1985.

John R. Mitchell, Charleston, W.Va., for appellant.

J. Bradley Russell, Asst. Atty. Gen., Charleston, W.Va., for appellee.

MILLER, Chief Justice.

Antoine Hickman was convicted by a jury in the Circuit Court of Mercer County of two counts of first degree murder.[1] His convictions resulted in two consecutive life without mercy sentences. The defendant argues his convictions should be reversed because his confessions were inadmissible for a variety of reasons and because he was intoxicated to such an extent at the time of the incident that he was incapable of premeditation. After a careful review of the arguments and the lengthy record before us, we conclude no errors were committed.

On June 26, 1981, shortly after 2:00 a.m., the defendant became involved in an argument with a woman in Spyro's Lounge in Charleston, West Virginia. Following this argument, the defendant and several other bar patrons left the bar and gathered on the adjacent sidewalk. A witness nearby noticed there was a group of people running and screaming in front of Spyro's. He reported this incident to several Charleston police officers, who were in a restaurant down the street from the bar. This witness also saw the defendant separate from the crowd and get into a yellow Cadillac driven by an Allen Mackie.

Two Charleston police officers, Eddie Ray Duncan and Delbert Junior Roush, Sr., who were on patrol in separate vehicles, were informed that the individual respon-

---

1. The murders occurred in Kanawha County, but the trial was held in Mercer County after the trial court granted the defendant's motion for a change of venue.

sible for an altercation at Spyro's Lounge was seen getting into a yellow Cadillac. Officer Duncan spotted the vehicle in question and followed it. After traveling for a few blocks, Mr. Mackie noticed a police car with flashing lights was behind him. Mr. Mackie parked his car and walked to the back of the vehicle to meet Officer Duncan, who was the first officer to arrive on the scene.

Officer Roush arrived thereafter in an unmarked vehicle. Mr. Mackie was asked if he had been involved in a fight at Spyro's and he explained that he had not, but that his passenger, the defendant, might have been involved. Officer Roush then went to the passenger side of the car and asked the defendant to get out, but the defendant refused. Subsequently, Officer Duncan joined Officer Roush and also asked the defendant to step out. Mr. Mackie testified that he then heard several shots and ran away from the scene. After a short while, Mr. Mackie returned to the scene, got into one of the police cars, and radioed police headquarters that two officers had been shot. Officers Duncan and Roush died from the gunshot wounds.

## I.

### ADMISSIBILITY OF CONFESSIONS

The defendant challenges the admissibility of one written confession and two oral confessions. He presents three different arguments against the admissibility of the confessions. First, the defendant contends when he was arrested, the State had already been informed that his parents had retained counsel for him. Nevertheless, the State interrogated the defendant without this counsel being informed of the arrest and without his presence. Second, the defendant contends he was intoxicated at the time of the confessions and, therefore, was incapable of voluntarily waiving his

rights. Third, the confessions were inadmissible because the State violated W.Va. Code, 62–1–5, our prompt presentment statute. In order to fully understand these arguments, additional facts relevant to the confessions must be examined.

At about 5:30 a.m. on June 26, 1981, two arrest warrants were sworn out against the defendant based upon information given to the police by Mr. Mackie. A widespread search for the defendant began. At some time between 4:00 p.m. and 5:30 p.m., Kanawha County Prosecuting Attorney James Roark met with defense attorney John Mitchell and members of the defendant's family in Mr. Mitchell's law office. Prosecutor Roark testified in the suppression hearing that the purpose of the meeting, which had been arranged by Mr. Mitchell, was to help facilitate the safe apprehension of the defendant. Prosecutor Roark's understanding was that Mr. Mitchell had not been retained by the family to represent the defendant, but rather was simply trying to help assure the peaceful arrest of the defendant.

Mr. Mitchell testified at the suppression hearing that he had been retained by the defendant's family to assist the defendant in the preliminary aspects of the case. He indicated that whether he would be representing the defendant after his arrest was unclear. He admitted he had never informed either Prosecutor Roark or any other State official that he had been retained to represent the defendant.[2]

Shortly after 6:00 p.m., Edward Leonard, an investigator for the Kanawha County prosecuting attorney's office, received a telephone call from a Kenny Jones, who informed him that the defendant was with him and was willing to be taken into custody. Mr. Leonard then drove to the agreed upon address in Charleston where he found

---

2. Mr. Mitchell testified at the suppression hearing as follows:

"I never went to Mr. Roark or talked with him in my office when he was there and specifically stated that I'm representing Antoine Hickman in these two murder cases, because I consider the murder case as the trial preparation and trial of the cases, and I

had not been retained by the family in that aspect of it. I was dealing with the preliminary aspects of it, of getting him into custody and, at least, my thinking process was to include the initial advice to the defendant once he was apprehended or had contacted me to give himself up."

the defendant. He returned to his office in the courthouse with the defendant and informed Prosecutor Roark by telephone that he had apprehended the defendant. Soon thereafter, Prosecutor Roark joined Mr. Leonard and the defendant. In response to a telephone call from Prosecutor Roark, Ivin Lee, a Charleston police officer, also went to Mr. Leonard's office.

Mr. Leonard was in the process of informing the defendant of his constitutional rights when Officer Lee entered the office. He began reading to the defendant his rights following the procedure enunciated in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966), at 6:42 p.m., according to the notation on the form. Mr. Leonard's testimony at the suppression hearing was that the defendant listened and initialed the form after each right had been explained to him. When Mr. Leonard finished reading the *Miranda* rights, the defendant signed the form acknowledging that he understood his rights. Mr. Leonard also testified he then explained to the defendant that he could waive the constitutional rights previously discussed, which the defendant agreed to do by signing the waiver portion of the form.

After the defendant had signed the waiver, Mr. Leonard stated he advised the defendant that his parents were in Charleston. The defendant's response, according to Mr. Leonard, was that he did not want any help from his parents. It was also at about this time that Prosecutor Roark who had been out of the room entered and also informed the defendant that his parents were in town and asked if the defendant would like to speak with them. Again the defendant indicated he did not want any help from his parents.

Officer Lee testified that at this point she placed the defendant under formal arrest for the two murders and again explained the *Miranda* rights to the defendant, following the same procedure used by Mr. Leonard. The defendant initialed and signed the form in the appropriate places, indicating he understood his rights and was willing to waive them. The time noted on this second form is 6:51 p.m. Officer Lee testified at the suppression hearing that after the defendant had signed this waiver of rights, Prosecutor Roark advised the defendant that his parents were in Charleston and had contacted an attorney. He asked the defendant if he wanted them to be with him, but the defendant indicated he did not want anybody.[3]

Following the second reading of the *Miranda* rights, the defendant's second signing of a waiver of rights form, and the prosecutor's offer to have the defendant's family and the attorney present, the defendant orally confessed to the two murders in the presence of Mr. Leonard and Officer Lee. According to Officer Lee, the defendant related that he did not want to get caught with some pills he had in his possession. When the first officer asked him to get out of the car and shined a flashlight in his face, the defendant shot him and then turned and shot the other officer. When he saw Mr. Mackie running away, the defendant fired at him also, but missed.

Patrick Legg, the Charleston police officer who had obtained the arrest warrants, arrived at the prosecuting attorney's office at around 8:00 p.m. He advised the defendant of his *Miranda* rights for the third time at 8:11 p.m. The defendant again signed the waiver of rights form after it had been explained to him. In the ensuing conversation with Officer Legg, the defendant for the second time orally confessed

---

3. Prosecutor Roark's testimony at the suppression hearing on this point is as follows:

"[A] After Ivin Lee had placed him under arrest and advised him of his rights, I advised him, again, that I had met with his parents in a lawyer['s] office and that I didn't know whether or not that lawyer would represent him or was going to represent him, but I asked him if he wanted me to try to contact that lawyer and have him present, and he

indicated that he didn't want anybody present. He didn't indicate, he said he didn't want anybody present.

"Q You mean he said the word I don't want anybody here, I don't want to talk to them. He actually said the word?

"A He said I don't want anybody here.

"Q Those were the words he used?

"A That's right."

to murdering the two police officers, telling essentially the same story he had told to Mr. Leonard and Officer Lee. Officer Legg then explained he wanted to get a stenographer, who had been notified at about 7:00 p.m. to come to the courthouse and was present when Officer Legg arrived, to record the defendant's statement. The written statement consists of the defendant answering questions asked by Officer Legg and was concluded at 8:58 p.m. Near the end of the written statement, Officer Legg asked the defendant whether he had been informed about his family and the attorney they had contacted:

> "Q. [Antoine], prior to taking this statement, Detective LEE and myself advised you, did I not, that we had knowledge that your parents were in Charleston, West [Virginia] and had consulted an attorney and you stated you did not wish to confer with these persons at this time. Is this correct?
>
> "A. I said my parents. I didn't know they had an attorney or not. I just wanted to give you a statement."[4]

The defense attorney Mr. Mitchell was not informed by Prosecutor Roark or any law enforcement officer that the defendant had been arrested. He learned of the arrest through other sources and arrived at the police station where the defendant was being processed at some time after 9:30 p.m. When he arrived at the police station, Mr. Mitchell was informed that the defen-

dant had given a statement and that they were waiting for the statement to be typed so the defendant could sign it. The defendant and Mr. Mitchell were allowed to use an interview room to consult. After Mr. Mitchell had consulted with the defendant, he informed Prosecutor Roark that upon advice of counsel, the defendant would not sign the written statement. When the typewritten statement was completed and given to the defendant, he refused to sign it.

## A.

### COUNSEL RETAINED BY PARENTS

The issue here is whether a defendant who is in custody and has had an attorney retained for him by his family can waive his right to counsel where the attorney's retention is known by police officials, but is not known by the defendant. We have not had occasion to discuss this issue in any of our prior cases. Other jurisdictions have decided this issue with varying results.

The most restrictive approach has been taken by the New York Court of Appeals, which has held that once the police know or have been apprised of the fact that a defendant is represented by counsel, the right to counsel attaches and this right to counsel cannot be waived by the defendant in the absence of such counsel. *People v. Arthur*, 22 N.Y.2d 325, 239 N.E.2d 537, 292 N.Y.S.2d 663 (1968).[5]

---

**4.** This is the only statement in the record of the defendant's version of the State's offer to bring his family and the attorney to him. The defendant did not testify at the suppression hearing or at trial. In his brief, the defendant's counsel concedes the following facts relevant to the confessions:

> "It should be noted that Mr. Leonard testified in the suppression hearing that, before he travelled to the West Side of Charleston to meet with Antoine Hickman, he knew nothing of the involvement of either Antoine Hickman's family or of John Mitchell or any other lawyer.... It should also be noted from the reading of the transcript of the suppression hearing that all employees of the Prosecutor's office and the Charleston City Police Department were careful not to pose any questions to Mr. Hickman until after Miranda rights had been read and after Antoine Hickman had signed a waiver of rights which was contained on the Miranda right[s] form. Antoine

Hickman did sign three such waiver forms during the course of the evening. There is no evidence that Mr. Hickman was ever handcuffed during that evening or was otherwise restrained. There is also nothing to indicate that Mr. Hickman was ever threatened, beaten, or treated rudely or impolitely. At no time were guns openly displayed, although both Mr. Leonard, Mr. Legg and Ms. Lee all state that they wore weapons during the times they were with him in Mr. Leonard's office."

**5.** The relevant portions of *Arthur*'s holdings are:

> "[O]nce the police know or have been apprised of the fact that the defendant is represented by counsel or that an attorney has communicated with the police for the purpose of representing the defendant, the accused's right to counsel attaches; and this right is not dependent upon the existence of a formal retainer.

A majority of other jurisdictions are less restrictive than New York and hold that a defendant who is being held for custodial interrogation must be advised, in addition to the *Miranda* rights, that counsel has been retained or appointed to represent him where the law enforcement officials involved have knowledge of the attorney's retention or appointment. This rule is based on the theory that without this information, a defendant cannot be said to have voluntarily and intelligently waived his right to counsel. *See, e.g., People v. Harris*, 703 P.2d 667 (Colo.App.1985); *Weber v. State*, 457 A.2d 674 (Del.1983); *People v. Smith*, 93 Ill.2d 179, 66 Ill.Dec. 412, 442 N.E.2d 1325 (1982); *State v. Matthews*, 408 So.2d 1274 (La.1982); *Lodowski v. State*, 302 Md. 691, 490 A.2d 1228 (1985); *Elfadl v. State*, 61 Md.App. 132, 485 A.2d 275 (1985); *Commonwealth v. McKenna*, 355 Mass. 313, 244 N.E.2d 560 (1969); *State v. Luck*, 15 Ohio St.3d 150, 472 N.E.2d 1097 (1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1845, 85 L.Ed.2d 144 (1985); *Lewis v. State*, 695 P.2d 528 (Okla.Ct.Crim.App. 1984); *State v. Haynes*, 288 Or. 59, 602 P.2d 272 (1979) (In Banc), *cert. denied*, 446 U.S. 945, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980); *State v. Jones*, 19 Wash.App. 850, 578 P.2d 71 (1978).[6]

The Oregon Supreme Court has formulated one of the most commonly quoted reasons for requiring law enforcement officials to adivse a defendant that counsel has been retained or appointed for him in order to effectuate a valid *Miranda* waiver in *State v. Haynes*, 288 Or. at 72, 602 P.2d at 278:

> "To pass up an abstract offer to call some unknown lawyer is very different from refusing to talk with an identified attorney actually available to provide at least initial assistance and advice, whatever might be arranged in the long run. A suspect indifferent to the first offer may well react quite differently to the second. If the attorney appears on request of one's family, that fact may inspire additional confidence." (Footnote omitted).

The Delaware Supreme Court spoke forcefully on this issue in *Weber v. State*, 457 A.2d at 685–86:

> "When a suspect does not know that an attorney, who has been retained or properly designated to represent him, is actually present in the police station seeking an opportunity to render legal assistance, and the police do not inform him of that fact, there can be no intelligent and knowing waiver.... The *Miranda* warnings indicate to the suspect an abstract right to counsel, and the waiver of that right only means that for the moment the suspect is foregoing the exercise of that conceptual privilege. But that is clearly distinct from the opportunity to confer with a specifically

"... Once an attorney enters the proceeding, the police may not question the defendant in the absence of counsel unless there is an affirmative waiver, in the presence of the attorney, of the defendant's right to counsel.... There is no requirement that the attorney or the defendant request the police to respect this right of the defendant." 22 N.Y.2d at 329, 239 N.E.2d at 539, 292 N.Y.S.2d at 666. (Citations omitted).

The basis for New York's rule is its state constitution. *See People v. Donovan*, 13 N.Y.2d 148, 193 N.E.2d 628, 243 N.Y.S.2d 841 (1963).

**6.** A few courts have discussed the issue utilizing what is termed a totality of the circumstances test, but have emphasized that informing the defendant that an attorney has been retained for him is critical to a valid waiver. *E.g., Yates v. State*, 467 So.2d 884 (Miss.1984); *Dunn v. State*, 696 S.W.2d 561 (Tex.Crim.App.1985) (En Banc). A totality approach was used in *State v. Beck*, 687 S.W.2d 155 (Mo.1985) (En Banc), where the court found a valid waiver even though the police did not advise the defendant that an attorney was trying to contact him. The court upheld the defendant's waiver on the theory he had specific knowledge of his right to counsel because the defendant had several days prior to his arrest requested his mother to obtain counsel for him.

Several states appear to hold that the failure of the police to disclose the availability of an attorney retained for a defendant has no effect on the defendant's voluntary and intelligent waiver of his right to counsel. *Blanks v. State*, 254 Ga. 420, 330 S.E.2d 575 (1985); *State v. Blanford*, 306 N.W.2d 93 (Iowa 1981); *State v. Burbine*, 451 A.2d 22 (R.I.1982). *Burbine* was overturned in a habeas corpus proceeding, *Burbine v. Moran*, 753 F.2d 178 (1st Cir.1985), and certiorari was granted by the United States Supreme Court, 471 U.S. 1098, 105 S.Ct. 2319, 85 L.Ed.2d 838 (1985).

retained or designated attorney who is actually present, seeking to render legal assistance. . . .

"... To allow the police to use tactics which prevent or forestall a suspect from exercising his rights is inconsistent with the clear purpose of *Miranda*.... Furthermore, the use of such tactics is logically incongruous with the concept of a knowing and intelligent waiver...." (Citations omitted).

■ We are persuaded by the majority view which holds that a defendant being held for custodial interrogation must be advised, in addition to the *Miranda* rights, that counsel has been retained or appointed to represent him where the law enforcement officials involved have knowledge of the attorney's retention or appointment. To allow law enforcement officials simply to recite the *Miranda* rights without mentioning the availability of a specific attorney is inherently deceptive and cannot be countenanced if the principles of *Miranda* are to retain their validity.

■ Some courts incorrectly have characterized the majority view we have adopted as a variation of the restrictive New York rule, but we disagree. We previously rejected the New York rule, which requires the presence of counsel to waive the right to counsel, in *State v. Wyer*, 173 W.Va. 720, 320 S.E.2d 92 (1984). In *Wyer*, we discussed at some length the difference between the right to counsel under the Fifth and Sixth Amendments. We cited *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), where the United States Supreme Court pointed out,

as it had done in earlier cases, that the Fifth Amendment right to counsel was created in *Miranda* as an adjunct to the defendant's right against self-incrimination. This Fifth Amendment right to counsel is triggered when a defendant. is taken into custody by law enforcement officials who desire to interrogate him.[7]

The Sixth Amendment right to counsel arises, as we observed in *Wyer*, when adversary judicial proceedings have been commenced against a defendant and we quoted from *Brewer v. Williams*, 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424, 436 (1977):

"Whatever else it may mean, the right to counsel granted by the Sixth and Fourteenth Amendments means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him—'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.' [*Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411, 417 (1972).]" (Citations omitted).

*See also State v. Gravely*, 171 W.Va. 428, 299 S.E.2d 375 (1982).

After concluding that the Sixth Amendment right to counsel had attached in *Wyer*, we held in Syllabus Point 3, in part: "There is no per se rule against a waiver of the Sixth Amendment right to counsel. We do, however, hold that a waiver of the Sixth Amendment right to counsel should be judged by stricter standards than a waiver of the Fifth Amendment right to counsel...."[8]

---

**7.** In *Edwards*, 451 U.S. at 481–82, 101 S.Ct. at 1883, 68 L.Ed.2d at 384, the United States Supreme Court explained:

"In *Miranda v. Arizona*, the Court determined that the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination required that custodial interrogation be preceded by advice to the putative defendant that he has the right to remain silent and also the right to the presence of an attorney.... The Court also indicated the procedures to be followed subsequent to the warnings. If the accused indicates that he wishes to remain silent, 'the interrogation must cease.' If he requests counsel, 'the inter-

rogation must cease until an attorney is present.' [384 U.S. at 474, 86 S.Ct. at 1628, 16 L.Ed.2d at 723, 10 A.L.R.3d at 1011].

"*Miranda* thus declared that an accused has a Fifth and Fourteenth Amendment right to have counsel present during custodial interrogation."

**8.** The remaining portion of Syllabus Point 3 of *Wyer* states:

"Furthermore, we do not equate a general request for counsel at the initial appearance before a magistrate as foreclosing in all cases the right of police officials to initiate a further discussion with the defendant to determine if

In Syllabus Point 4 of *Wyer*, we set out the requirements for the waiver of a defendant's Sixth Amendment right to counsel and concluded, in addition to the *Miranda* rights, he must be informed of the nature of the charge and must execute a written waiver of his rights.[9] Thus, *Wyer*, which involved the Sixth Amendment right to counsel, clearly rejects the New York rule, which is premised on the right to counsel under both the Fifth and Sixth Amendments.

The central issue raised in the present case is the validity of the defendant's three waivers of the right to counsel. We have held that courts will " 'indulge every reasonable presumption against waiver of a fundamental constitutional right and will not presume acquiescence in the loss of such fundamental right.' " Syllabus Point 2, *State ex rel. Browning v. Boles*, 149 W.Va. 181, 139 S.E.2d 263 (1964) (citation omitted). *See also State v. McNeal*, 162 W.Va. 550, 555, 251 S.E.2d 484, 487 (1978), *citing Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), and *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357 (1938).

*McNeal* also noted that the burden is on the State to prove the waiver and cited *Brewer v. Williams*, 430 U.S. at 404, 97 S.Ct. at 1242, 51 L.Ed.2d at 439–40, which summarized this law as follows:

"[I]n determining the question of waiver as a matter of federal constitutional law ... it was incumbent upon the State to prove 'an intentional relinquishment or abandonment of a known right or privilege.' *Johnson v. Zerbst*, 304 U.S. [at 464, 58 S.Ct. at 1023, 82 L.Ed. at 1466, 146 A.L.R. at 362]. That standard has

been reiterated in many cases. We have said that the right to counsel does not depend upon a request by the defendant ... and that courts indulge in every reasonable presumption against waiver.... This strict standard applies equally to an alleged waiver of the right to counsel whether at trial or at a critical stage of pretrial proceedings...." (Citations omitted).

■ After examining the facts of this case in light of the foregoing law, we conclude the State met its burden in proving the defendant voluntarily and intelligently waived his right to counsel. On June 26, 1981, after he had voluntarily allowed Mr. Leonard to take him into custody, the defendant was advised of the *Miranda* rights on three different occasions by three different law enforcement officials. On each occasion, the defendant initialed and signed the forms indicating he understood his rights and then signed the waiver part of the forms.

The critical factor in the present case is that the defendant was advised that his parents had contacted an attorney and was asked if he wanted the attorney present. This information was given by Prosecutor Roark who, as earlier noted, testified that the defendant indicated he did not want anybody. This conversation was corroborated by Mr. Leonard and Officer Lee, who were present in the room at the time. Since the defendant was fully informed of his *Miranda* rights and of the fact that his family had contacted an attorney on his behalf and was asked if he wanted to consult with the attorney, which he declined, we conclude the defendant voluntarily and intelligently waived his Fifth Amendment right to counsel.[10]

---

he is willing to waive his Sixth Amendment right to counsel for purposes of procuring a confession."

**9.** Syllabus Point 4 of *Wyer* states:

"Because of the higher standard against which the Sixth Amendment right-to-counsel waiver is measured, we hold that once the Sixth Amendment right to counsel has attached, it can only be waived by a written waiver signed by the defendant. It must also be shown at the time that the waiver is executed that the defendant was aware that he

was under arrest and had been informed of the nature of the charge against him. These elements must be shown in addition to the customary *Miranda* warnings."

**10.** The defendant does not argue that his Sixth Amendment right to counsel was violated. Even if this right were implicated, we believe the facts of this case would satisfy the waiver requirements summarized in Syllabus Point 4 of *Wyer*. *See* note 9, *supra*. There is no dispute in this case that the defendant did sign three written *Miranda* waivers and had been informed in

## B.

## PROMPT PRESENTMENT

In his brief, the defendant raises for the first time the issue of whether his confessions should be deemed inadmissible as a result of the State's delay in presenting him before a magistrate in violation of W.Va.Code, 62-1-5. The State urges us to abandon or modify the rule stated in Syllabus Point 6 of *State v. Persinger,* 169 W.Va. 121, 286 S.E.2d 261 (1982): "The delay in taking the defendant to a magistrate may be a critical factor where it appears that the primary purpose of the delay was to obtain a confession from the defendant." [11]

We decline to abandon this rule as we believe it gives meaning to our prompt presentment statute, W.Va.Code, 62-1-5, which is also embodied in Rule 5(a) of the West Virginia Rules of Criminal Procedure.[12] The fundamental issue presented by the defendant's argument is whether the *Persinger* rule has retroactive application to confessions taken prior to the date of the opinion, which was filed on January 19, 1982. The confessions in this case were obtained on June 26, 1981.

In *Adkins v. Leverette,* 161 W.Va. 14, 239 S.E.2d 496 (1977), we discussed the concept of retroactivity and stated in Syllabus Point 1:

"The concept of retroactivity determines how a case which substantially alters a relevant body of prior law should be applied to other cases."

*See also Bowman v. Leverette,* 169 W.Va. 589, 604, 289 S.E.2d 435, 444 (1982). We also discussed in *Adkins* various decisions of the United States Supreme Court involving retroactivity concepts where new constitutional rules were decided and quoted the formulation developed in *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).[13]

In *State v. Gangwer,* 168 W.Va. 190, 283 S.E.2d 839 (1981), we examined the retroactivity of an earlier decision, *State v. Kirtley,* 162 W.Va. 249, 252 S.E.2d 374 (1978), which dealt with the burden of proof on self-defense.[14] In *Gangwer* the trial occurred before the *Kirtley* opinion, but the defendant had made a specific objection at trial that the burden of proof language in the State's self-defense instruction was incorrect. We pointed out in *Gangwer* that the *Kirtley* ruling was not of a constitutional dimension and created in Syllabus Point 3 a retroactivity rule applicable to new principles of law that were not of a constitutional dimension:

"In the absence of any substantial countervailing factors, where a new rule of criminal law is made of a nonconstitutional nature, it will be applied retroactively only to those cases in litigation or

---

advance of the nature of the charges against him for which he was arrested.

**11.** In Syllabus Point 1 of *State v. Guthrie,* 173 W.Va. 290, 315 S.E.2d 397 (1984), we modified Syllabus Point 6 of *Persinger* to demonstrate that the delay was a critical factor under the totality of circumstances which is the general standard for judging the admissibility of a confession:

"'The delay in taking a defendant to a magistrate may be a critical factor [in the totality of circumstances making a confession involuntary and hence inadmissible] where it appears that the primary purpose of the delay was to obtain a confession from the defendant.' Syllabus Point 6, *State v. Persinger,* 169 W.Va. 121, 286 S.E.2d 261 (1982), as amended."

**12.** The pertinent portion of W.Va.Code, 62-1-5, provides: "An officer making an arrest under a warrant issued upon a complaint, or any person

making an arrest without a warrant for an offense committed in his presence, shall take the arrested person without unnecessary delay before a [magistrate] of the county in which the arrest is made...."

**13.** In *Stovall,* 388 U.S. at 297, 87 S.Ct. at 1970, 18 L.Ed.2d at 1203, the United States Supreme Court stated: "The criteria guiding resolution of the question [of retroactivity] implicate (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards."

**14.** In *Kirtley,* we held in Syllabus Point 4: "Once there is sufficient evidence to create a reasonable doubt that the killing resulted from the defendant acting in self-defense, the prosecution must prove beyond a reasonable doubt that the defendant did not act in self-defense."

on appeal where the same legal point has been preserved." [15]

Because the issues in *Gangwer* and *Kirtley* were not of a constitutional dimension, we did not apply the principles enunciated in *Adkins* which are relevant to retroactivity of a constitutional issue. Under *Gangwer*'s retroactivity rule the defendant in the present case would not be entitled to relief under *Persinger* because the "legal point had [not] been preserved" by a proper objection as required by Syllabus Point 3 of *Gangwer.*

Whether the *Persinger* rule can be characterized as a rule of a purely nonconstitutional dimension is a somewhat more difficult question. We indicated in *State v. Manns*, 174 W.Va. 793, 798, 329 S.E.2d 865, 871 (1985), that our prompt presentment cases were not based on constitutional grounds, but rather were premised on the mandate of W.Va.Code, 62–1–5. Under *Persinger*, if the primary purpose of the delay in taking the defendant to a magistrate is to obtain a confession, then the confession may be ruled inadmissible. To this extent, the *Persinger* rule can be said to have some constitutional ramifications.

Even if we were to apply the more general standard for retroactivity of a new constitutional ruling as set out in *Stovall* and which we adopted in *Adkins*, we do not believe that *Persinger* would be retroactive. Recently in *Solem v. Stumes*, 465 U.S. 638, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984), the United States Supreme Court applied the *Stovall* factors in a rather analogous situation involving the retroactivity of *Edwards v. Arizona*, 451 U.S. 477,

101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). The United States Supreme Court recognized that the purpose of *Edwards* was to clarify an area of *Miranda*, which was whether once a defendant has asserted his desire to have counsel, can the police initiate further conversation with him to see if he desires to waive counsel. *Edwards* held that such a procedure violated the defendant's Fifth Amendment rights and rendered the subsequent confession inadmissible. Initially, the United States Supreme Court in *Solem* concluded this rule did not substantially impact upon the truthfinding process.[16]

The United States Supreme Court in *Solem* stated further that the *Edwards* rule was a substantial change not foreshadowed by earlier cases and that law enforcement officials could not be faulted for not anticipating the per se rule announced in *Edwards.* Finally, *Solem* found that substantial disruption would occur in the administration of justice if the rule in *Edwards* were made retroactive.[17]

If we evaluate *Persinger* under the retroactivity principles stated in *Stovall*,[18] we begin with an analysis of the purposes to be served by the rule in *Persinger.* As we have earlier mentioned, the purpose of *Persinger* was to give some meaning to the prompt presentment statute, W.Va.Code, 62–1–5. It was not fashioned as a constitutional mandate that affected the heart of the truthfinding function. The origin of W.Va.Code, 62–1–5, was traced in *Persinger*, 169 W.Va. at 132–133, 286 S.E.2d at 268–69, to Rule 5(a) of the Federal Rules of Criminal Procedure and its interpretation under *Mallory v. United States*, 354 U.S.

---

**15.** We acknowledged in *Gangwer* that the genesis for this rule was the retroactivity formulation in *Bradley v. Appalachian Power Co.*, 163 W.Va. 332, 256 S.E.2d 879 (1979).

**16.** *Solem* cites several cases where retroactivity had been accorded because the new constitutional rule substantially affected the truthfinding process. *Brown v. Louisiana*, 447 U.S. 323, 100 S.Ct. 2214, 65 L.Ed.2d 159 (1980); *Hankerson v. North Carolina*, 432 U.S. 233, 97 S.Ct. 2339, 53 L.Ed.2d 306 (1977).

**17.** In *Solem*, 465 U.S. at 650, 104 S.Ct. at 1345, 79 L.Ed.2d at 592, the United States Supreme Court concluded:

"In sum, *Edwards* has little to do with the truthfinding function of the criminal trial, and the rights it is designed to protect may still be claimed by those whose convictions preceded the decision. It would be unreasonable to expect law enforcement authorities to have conducted themselves in accordance with its bright-line rule prior to its announcement; and retroactive application would disrupt the administration of justice. Weighing these considerations, we conclude that *Edwards* should not be applied retroactively."

**18.** *Stovall's* test is set out in note 13, *supra.*

449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), where it was not treated as a rule of constitutional dimension.

When we consider the second factor of the *Stovall* formula, it cannot be said that law enforcement officials should have anticipated the *Persinger* rule from our earlier prompt presentment cases. The only decisions prior to *Persinger* in this area of prompt presentment were *State v. Slie*, 158 W.Va. 672, 213 S.E.2d 109 (1975), *State v. Mason*, 162 W.Va. 297, 249 S.E.2d 793 (1978), and *State v. Canby*, 162 W.Va. 666, 252 S.E.2d 164 (1979).

In *Slie*, we concluded the failure to follow the prompt presentment statute did not vitiate the defendant's conviction. In *Mason* we admonished, in the language of W.Va.Code, 62–1–5, that persons arrested shall be taken without unreasonable delay to a magistrate.[19] However, *Mason* did not decide what sanctions would apply if a prompt presentment had not been made. Finally, *Canby* mentioned the prompt presentment as possibly providing a break in the causal chain between an illegal arrest and a confession. This issue had nothing to do with sanctions for the failure to make a prompt presentment.[20] Thus, we conclude there was no case prior to *Persinger* which would have clearly foreshadowed its rule such that police officials should have anticipated it.[21]

The last consideration is the impact that retroactivity of the *Persinger* standard would have on the administration of justice. Undoubtedly, the question of delay in taking to a magistrate a person who has been arrested is an issue that frequently arises.[22] We recognized in *Persinger*, 169 W.Va. at 135, 286 S.E.2d at 270, that there are situations where the delay would be perfectly legitimate as where the delay was caused by "the necessity of performing customary booking and administrative procedures." However, the legitimacy of the delay is a factual inquiry which if retroactivity were to apply "would be hampered by problems of lost evidence, faulty memory, and missing witnesses." *Solem*, 465 U.S. at 650, 104 S.Ct. at 1345, 79 L.Ed.2d at 591.

In light of these factors, we conclude the impact on the administration of justice of retroactively applying *Persinger* would be substantial. When we weigh all of the *Stovall-Adkins* factors, we find that even if the *Persinger* rule were of a constitu-

**19.** Syllabus Point 1 of *Mason* states:
"The provision of W.Va.Code § 62–1–5 [1965] stating that '[a]n officer making an arrest upon a warrant issued upon a complaint, or any person making an arrest without a warrant for an offense committed in his presence, shall take the arrested person without unnecessary delay before a [magistrate] of the county in which the arrest is made,' is hereafter mandatory."

**20.** *Canby* recognized that under *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), the United States Supreme Court held that where an illegal arrest is made and a confession is obtained even though *Miranda* warnings are given, the confession will not be admissible unless there is a break in the causal connection and the confession. It was in light of this principle that *Canby* suggested that an intervening prompt presentment if shown would break the causal connection between the illegal arrest and the subsequent confession.

**21.** We acknowledge that several of our cases have discussed *Persinger* and involved confessions obtained prior to the date of the *Persinger* opinion. However, the issue of retroactivity of the *Persinger* rule was not raised nor discussed

in these cases. *E.g., State v. Guthrie, supra; State v. Mays*, 172 W.Va. 486, 307 S.E.2d 655 (1983); *State v. Wilson*, 170 W.Va. 443, 294 S.E.2d 296 (1982) (per curiam); *State v. Mitter*, 169 W.Va. 652, 289 S.E.2d 457 (1982). Of these decisions, only *Guthrie*, in Syllabus Point 1, and *Mitter*, in Syllabus Point 2, cite Syllabus Point 6 of *Persinger* as controlling. The other cases simply mention *Persinger* in dicta. Moreover, it is evident from reading the facts in *Guthrie* and *Mitter* that the issue of prompt presentment and its effect on a confession had been preserved for appeal by a proper objection and argument in the trial court, which meets the retroactivity test set out in Syllabus Point 3 of *Gangwer*.

**22.** Since our decision in *Persinger*, we have discussed the prompt presentment issue in a number of cases where the confessions were obtained after January 19, 1982, which is the date *Persinger* was filed. *See, e.g., State v. Bennett*, W.Va., 332 S.E.2d 845 (1985); *State v. Fauber*, 175 W.Va. 324, 332 S.E.2d 625 (1985) (per curiam); *Matter of Mark E.P.*, 175 W.Va. 83, 331 S.E.2d 813 (1985); *State v. Manns*, 174 W.Va. 793, 329 S.E.2d 865 (1985); *State v. Wyant*, 174 W.Va. 567, 328 S.E.2d 174 (1985) (per curiam).

tional dimension, it would not be applied retroactively.

As we have previously noted under *Gangwer* a new rule of criminal law will have some limited retroactivity to cases in litigation or on appeal where the point was preserved at trial. Therefore, we hold that the rule stated in Syllabus Point 6 of *Persinger* is not to be applied retroactively to a confession which was obtained prior to the date of that decision where no prompt presentment objection was made at trial. Since the confessions in the present case were obtained before our decision in *Persinger* and no prompt presentment objection was made before the trial court, we will not address the merits of this issue.[23]

## C.

### INTOXICATION

The defendant contends his confession should be ruled inadmissible because he was too intoxicated at the time to voluntarily and intelligently waive his constitutional rights. In Syllabus Point 1 of *State v. Hall*, 174 W.Va. 599, 328 S.E.2d 206 (1985), we held:

"A claim of intoxication may bear upon the voluntariness of a defendant's confession, but, unless the degree of intoxi-

cation is such that it is obvious that the defendant lacked the capacity to voluntarily and intelligently waive his rights, the confession will not be rendered inadmissible."

The defendant cites excerpts from his written statement to support his claim that he was intoxicated when he gave his confessions.[24]

Mr. Leonard, Officer Lee, and Officer Legg all testified that the defendant did not exhibit any signs of intoxication. According to their testimony, the defendant was alert, responsive to their questions, and appeared to be in control of his actions. Furthermore, it appears he was able to effectively communicate with his counsel, who arrived while his statement was being typed. Based on his counsel's advice, the defendant refused to sign the typed statement.

Upon all of the evidence before it, the trial court concluded the defendant was not intoxicated at the time of the confessions to such an extent that as a matter of law he was not capable of voluntarily and intelligently waiving his rights. Our well settled rule on the admissibility of a confession is set out in Syllabus Point 5 of *State v. Starr*, 158 W.Va. 905, 216 S.E.2d 242 (1975):

---

**23.** We have also accepted the general rule that "ordinarily the time taken to reduce an oral confession to writing does not count on the unreasonable delay issue." *State v. Ellsworth J.R.*, 175 W.Va. 64, 70, 331 S.E.2d 503, 508–09 (1985). *See also State v. Mitter*, 169 W.Va. at 658, 289 S.E.2d at 461. In this case, the two oral confessions were brief and occurred almost contemporaneously. The written confession was recorded promptly following the second oral confession. While it was being typed and the defendant was being processed at the police station, the defense attorney appeared and consulted with the defendant advising him not to sign the typed statement, which advice the defendant followed. Shortly after this refusal to sign the typed statement, the defendant was taken before a magistrate. It is doubtful under these circumstances that the prompt presentment rule was violated.

**24.** The following are relevant excerpts from the defendant's written statement:

"Q. [Antoine], at the present time, are you under the influence of any alcohol or drugs?

"A. Yes. Alcohol and drugs.

"Q. When is the last time you consumed alcohol?

"A. Right before I came here.

"Q. How much did you consume?

"A. About a glass of wine. I smoked some pot and some dust. A little bit.

"Q. [Antoine], at the present time are you alert and know what you are saying and doing?

"A. I am a little high, but I ain't drunk.

\* \* \* \* \* \*

"Q. [Antoine], you stated you consumed a certain amount of marijuana. Approximately how much did you consume?

"A. About 7 or 8. Maybe 9.

"Q. When did you first smoke a joint after this incident occurred?

"A. When I was resting. After I was resting on top of a building. I took a pill and smoked maybe 2–3 joints.

"Q. What type of pill did you take?

"A. One of them was green and white. They call them speed. One was green and white, one was black."

"The State must prove, at least by a preponderance of the evidence, that confessions or statements of an accused which amount to admissions of part or all of an offense were voluntary before such may be admitted into the evidence of a criminal case."

See also Syllabus Point 9, State v. Cook, 175 W.Va. 185, 332 S.E.2d 147 (1985); Syllabus Point 1, State v. Williams, 171 W.Va. 556, 301 S.E.2d 187 (1983); Syllabus Point 3, State v. Persinger, supra.

Our standard for reviewing a trial court's decision on the voluntariness of a confession is summarized in Syllabus Point 3 of State v. Vance, 162 W.Va. 467, 250 S.E.2d 146 (1978):

"A trial court's decision regarding the voluntariness of a confession will not be disturbed unless it is plainly wrong or clearly against the weight of the evidence."

See also Syllabus Point 5, Matter of Mark E.P., 175 W.Va. 83, 331 S.E.2d 813 (1985); Syllabus Point 2, State v. Gwinn, 169 W.Va. 456, 288 S.E.2d 533 (1982); Syllabus Point 3, State v. Goodmon, 170 W.Va. 123, 290 S.E.2d 260 (1981).

■ We believe the trial court was correct in holding that the defendant's confessions were not rendered inadmissible by virtue of intoxication. Therefore, we conclude none of the three claims raised against the admissiblity of the defendant's confessions have merit.

## II.

### INTOXICATION DEFENSE

Finally, the defendant argues his first degree murder convictions must be reversed as a matter of law because at the time of the incident, he was so intoxicated by alcohol and drugs that he was incapable of premeditation. The defendant essentially asserts the theory outlined in Syllabus Point 2 of State v. Keeton, 166 W.Va. 77, 272 S.E.2d 817 (1980), where we held that voluntary drunkenness can in certain circumstances reduce first degree murder:

"Voluntary drunkenness is generally never an excuse for a crime, but where a defendant is charged with murder, and it appears that the defendant was too drunk to be capable of deliberating and premeditating, in that instance intoxication may reduce murder in the first degree to murder in the second degree, as long as the specific intent did not antedate the intoxication."

We reversed the conviction in Keeton because the trial court had failed to give any instruction to the jury relative to the effect of the defendant's intoxication.

Here the trial court did give defendant's Instruction No. 3, which was patterned after Syllabus Point 2 of Keeton. However, the defendant argues the evidence of intoxication was so overwhelming that the trial court should have ruled as a matter of law that convictions for first degree murders were not warranted.

Three lay witnesses, who had been with the defendant periodically during the day and evening of June 25, 1981, testified for the defendant. Each witness had been with the defendant at different locations and at different times. They testified to seeing the defendant drink an indeterminate amount of alcoholic beverages, including beer and whiskey. Two of these witnesses observed the defendant smoke marijuana and one shared a joint of phencyclidine (PCP) with him. None of these witnesses testified that the defendant appeared to have difficulty in walking or exhibited other signs of physical impairment.

The defense presented two psychiatrists who testified that the defendant was under the influence of alcohol and drugs at the time of the murders. Their testimony was based upon interviews with the defendant, an examination of the defendant's history of alcohol and drug abuse, and an examination of a variety of relevant documents, including the defendant's written statement.

■ The State offered three psychiatrists who answered lengthy hypothetical questions which summarized the relevant facts regarding the defendant's activities prior to the shootings and his recollection of the crimes as evidenced by the facts

contained in his written confession. They concluded the defendant was not impaired by virtue of alcohol and drugs at the time of the murders. Given these conflicting facts and medical opinions, the *Keeton* issue was clearly one for jury resolution under our traditional rule contained in Syllabus Point 4 of *State v. Taft*, 144 W.Va. 704, 110 S.E.2d 727 (1959):

> "'Where the testimony on an issue of fact in a criminal case is conflicting, it is for the jury to determine the weight to be attached to the reasonable inferences that can be drawn from all the facts and circumstances in evidence, and their verdict will not be set aside by the appellate court unless plainly wrong.' Syl., *State v. Magdich*, 105 W.Va. 585 [143 S.E. 348 (1928)]."

For the foregoing reasons, we conclude there was no reversible error committed in this case and, therefore, we affirm the judgment.

Affirmed.