369 S.E.2d 701

**STATE of West Virginia**

v.

**Clarence B. HALL.**

**No. 17352.**

Supreme Court of Appeals of
West Virginia.

Jan. 28, 1988.

Rehearing Denied May 18, 1988.

Frank W. Helvey, Jr., Charleston, for appellant.

J. Bradley Russell, Charleston, for respondent.

BROTHERTON, Justice:

In this case, Clarence B. Hall appeals his conviction by a Nicholas County jury on a charge of felony-murder. He alleges three errors: First, that a written statement he gave to the police was not made voluntarily, because he had been beaten repeatedly by a local deputy sheriff during the course of the investigation; second, that the police did not comply with our statutory require-

ment of prompt presentment before a neutral magistrate; and third, that the trial court gave an unconstitutional burden-shifting alibi instruction to the jury in his case. For the reasons stated below, we find no reversible error, and therefore affirm.

On the morning of April 19, 1980, police responded to a citizen's telephone call and discovered the slumped-over body of a man in a locked passenger cab of a Ford pickup truck parked at the bottom of Fayette Station Mountain in Fayette County. The body was later identified as that of Ralph Barnette. The apparent cause of death was a single gunshot wound to the head. The pickup truck in which Mr. Barnette's body was found was registered in the name of James Carr. Soon after the discovery of Barnette's body, the body of Carr's wife, Fay, was discovered in the Witcher Creek area of Kanawha County. She had been shot three times.

The same morning, the police located a pickup truck belonging to Mr. Barnette in a wooded area near Muddlety, Nicholas County. All four tires of the truck had been slashed and a bullet had been fired into the radiator.

It appears from the evidence adduced at trial that on the night of April 18, 1980, the appellant, Clarence Hall, and his brother, James, had decided to rob Fay Carr. The appellant's brother had double-dated with Fay Carr and Ralph Barnette, and knew that Mrs. Carr usually carried a large amount of cash. The Hall brothers cruised the streets of Summersville and the back roads of Nicholas County, looking for their intended victim. The two men eventually found Barnette's empty truck, and disabled it by slashing the tires and shooting the radiator. They proceeded to track down and corner Carr and Barnette in Carr's pickup.

In a written confession, which the appellant asserts should have been excluded at trial, Clarence Hall related that he kept his gun on Barnette while his brother took Carr around to the back of the truck. Clarence Hall told police that his gun accidently went off when Barnette acted as if he was going to jump at Hall. The brothers left Barnette in the pickup truck and Clarence Hall drove it to Fayette Station, where he left the truck, with Barnette's body, and joined his brother and Mrs. Carr in the Halls' vehicle. They then drove into Kanawha County, where the appellant's brother allegedly shot Fay Carr three times at close range.

Within a few days of the discovery of the bodies of Barnette and Carr, Deputy David E. Brown of the Fayette County Sheriff's Department,[1] along with another officer, drove to the appellant's home in Belpre, Ohio. They arrived at approximately 11:00 p.m., April 22, and the appellant agreed to answer questions concerning the murders of Ralph Barnette and Fay Carr. The appellant spent the entire night with the two officers, answering questions and attempting to substantiate an alibi for the night in question. The appellant claims that in the early morning of April 23, while parked outside the police station in Belpre, Ohio, Deputy Brown accused him of lying and covering up for his brother, beat him, and made threats against Hall's life should the deputy ever have the occasion to arrest him. After the alleged beating, the appellant drove or was driven to the Parkersburg police station for further questioning, and returned home at approximately 6:30 a.m.

On April 25, at the Parkersburg state police detachment, Clarence Hall met Trooper R.R. Custer of the Glasgow detachment in Kanawha County. Custer was the chief investigating officer of the murder of Fay Carr, and had come to Parkersburg to talk to the appellant after learning that Deputy Brown suspected Hall in connection with the murder of Ralph Barnette. The appellant testified at the suppression hearing that he also encountered Deputy Brown that day in the state police barracks in Parkersburg, and that Deputy Brown

---

1. Until the appellant's confession, police assumed that Barnette had been murdered in Fayette County, where they found his body.

kicked him in the chest, and again threatened to kill him. Hall said in addition that he was beaten that day by Trooper Radcliffe of the State Police, in the presence of Trooper Custer.

Custer and Hall met again the next day at the Summersville state police detachment, where Hall had presented himself voluntarily for further questioning. Three days later, on April 29, the two met for the third time, at the appellant's Belpre home. At that meeting, Clarence Hall informed Trooper Custer that both he and his brother, James, had consulted an attorney and been advised not to talk further with the police. Upon being so informed, Custer left without further conversation.

Custer returned the next day, however, to Belpre, Ohio, this time going to the home of the appellant's brother, James Hall, where they were joined by the appellant. Trooper Custer testified that he spent the day with the two brothers, had supper with them, and "had a nice time."

Eight days after Trooper Custer's social visit to the Hall brothers, at approximately 11:30 a.m. on May 8, 1980, Clarence Hall again encountered Fayette County Deputy Brown, this time at the sheriff's department in Marietta, Ohio, where the appellant had come to contact a probation officer in connection with an unrelated offense. The appellant testified that on that occasion Brown warned him that he intended to arrest Clarence Hall and his brother that afternoon, and made reference to his promise to kill Clarence Hall if he ever had occasion to arrest him.

Four hours later, at approximately 3:00 p.m. on May 8, 1980, the appellant called Trooper Custer from his home in Belpre, Ohio, and requested a meeting. They agreed to meet at the Fairplain Truckstop near Ripley, West Virginia, which is approximately halfway between Belpre and Custer's Glasgow, West Virginia, detachment.

At that meeting, Clarence Hall orally confessed to Trooper Custer that he had killed Ralph Barnette and that his brother, James, had killed Fay Carr. He then agreed to return to the Glasgow detachment with Custer in order to give a written statement. Leaving Hall's pickup at the truckstop, the pair travelled together in Custer's police cruiser to the Glasgow detachment. At approximately 5:30 p.m., Hall, in the presence of several police officers and an assistant prosecuting attorney from Kanawha County, gave a lengthy oral statement, followed by a series of questions and answers concerning the murders, all of which was taken down in shorthand by the detachment secretary. In the statement, Hall indicated that during the planned robbery of Barnette and Carr in Nicholas County he accidentally shot Barnette and then he and his brother drove the body to Fayette Station. He said that his brother, James, later shot Carr at the Witcher Creek location where the body was discovered. During the taking of the statement, the appellant was allowed to leave the room to go to the bathroom, and was given coffee to drink and later taken to a restaurant for dinner. At the end of the statement, the assistant prosecuting attorney asked Clarence Hall if there was anything he wanted to add. He responded: "I am glad I told you this. I am nervous but I feel better. No one forced me to do anything and everyone has been good to me."

After giving the statement, Hall apparently agreed to assist the officers to nail down a few more details of the crime. Hall told the officers he had thrown the murder weapon into a lake in Washington County, Ohio. Custer, Hall, the assistant prosecuting attorney, another state police officer, and a civilian diver started to Ohio to search for the weapon. They stopped at the Fairplain Truckstop where appellant Hall, accompanied by a trooper, was permitted to drive his own truck to his Belpre, Ohio, home. When they arrived in Belpre, the appellant visited with his wife briefly, and then accompanied the authorities back to Parkersburg, West Virginia. From Parkersburg, Clarence Hall telephoned his brother, James, and attempted to lure him into West Virginia for service of an arrest warrant, with a story about car trouble. His attempt failed, as did an underwater

search for the gun. The party then returned to West Virginia, had breakfast in Parkersburg, stopped at the South Charleston detachment to pick up the typed transcript of Hall's statement,[2] and arrived at the Kanawha County Courthouse at approximately 6:00 a.m.

At the Kanawha County Courthouse, the appellant was given his typed statement and asked to read and sign it. After he signed the confession, initialing each page and representing that he understood it, Clarence Hall was formally arrested and presented to a magistrate. The arrest and presentment occurred some fourteen hours after his initial oral confession to Trooper Custer at the Fairplain Truckstop.

Clarence Hall was tried on the charge of felony-murder before a jury in Nicholas County. The defense theory of the case was alibi. The inculpatory statements made by the appellant were explained as having been coerced by the beatings allegedly administered by Fayette County Deputy Sheriff Brown, coupled with the appellant's trust in Trooper Custer. The prosecution relied on the oral and written confessions given to the police, along with various other physical and circumstantial evidence.

## I. Voluntariness of Confession

The Fifth Amendment of the United States Constitution and Article 3, Section 5 of the West Virginia Constitution guarantee that no person shall be compelled to be a witness against himself in a criminal case. This means that the State may not use statements stemming from custodial interrogation of a defendant unless it proves by a preponderance of the evidence that the confession was voluntary viewing the totality of the circumstances. *State v. Persinger*, 169 W.Va. 121, 286 S.E.2d 261, 267 (1982); syl. pt. 5, *State v. Starr*, 158 W.Va. 905, 216 S.E.2d 242 (1975). The "totality of the circumstances" means that a court reviewing the voluntariness of a confession must look at both the conduct of the police in the investigation and the particular characteristics of the accused.

*State v. Williams*, 171 W.Va. 556, 301 S.E.2d 187, 189 (1983).

Although this Court has not had occasion to address the issue, it is recognized generally that if coercive tactics are employed, their "taint" may be neutralized in some cases by *Miranda* warnings, the passage of time, or other circumstances surrounding the confession. In *Almon v. Jernigan*, 715 F.2d 1505 (11th Cir.1983), *cert. denied* 466 U.S. 906, 104 S.Ct. 1684, 80 L.Ed.2d 158 (1984), for example, a deputy sheriff, who was also the son of the manslaughter victim, apprehended the defendant, struck him, kicked him, and shot him in the hand. The defendant confessed the following day to another officer. *Id.* at 1506. A federal appeals court rejected the defendant's claim on habeas corpus that his confession had been involuntary, noting that the record did not support the defendant's contention that the pain was so great as to affect the voluntariness of his statement, and that the officer to whom the confession was made employed no coercion or threats. *Id.* at 1507–08. *Cf. Hill v. State*, 91 Wis.2d 315, 283 N.W.2d 585 (Ct.App.1978) (fifteen-to-thirty minute delay between alleged police assault and confession not sufficient to dissipate effects of coercion).

■ As related above, Hall testified at the suppression hearing that Deputy Sheriff Brown physically beat or kicked him on two occasions, that State Trooper Radcliffe beat him on one occasion, and that Deputy Brown threatened his life three times. There is evidence in the record, including the testimony of Trooper Custer, tending to substantiate the appellant's assertion that Deputy Brown physically abused the appellant, and that the appellant was noticeably afraid of Deputy Brown. We do not condone such conduct, but the question is whether it directly produced the confession. The State points to several factors that negate the likelihood that Hall's confession resulted from Deputy Brown's misconduct, including that the defendant received multiple *Miranda* warnings, clearly understood their import, had experience in dealing with

---

**2.** Another officer had taken the typed statement from Glasgow to the South Charleston detach-

ment, and left it there to be picked up by Trooper Custer.

the law, had been advised by an attorney not to talk to the police, and initiated his own confession from another state.

Clarence Hall confessed thirteen days after the last alleged beating. He gave his statement to an officer other than the one he claimed had administered the physical coercion. Further, Hall volunteered to come into West Virginia from Ohio, where he could not have been arrested by West Virginia authorities, to give a statement to the police here. He also indicated that he was glad to get the information off his chest, and that his confession was not the result of any coercion or compulsion by the police. Hall testified that he had the equivalent of four years of college. He also was familiar with police interrogations and with his rights with regard to giving statements to the police, because he was on parole from a felony conviction for an offense committed in another state at the time of this crime. He and his brother consulted an attorney after the second incident with Deputy Brown, and the attorney advised them not to talk to the police. Clarence Hall had in fact terminated one conversation with Trooper Custer for this reason. He nevertheless initiated the May 8 contact, and made his confession.

We believe that the passage of thirteen days' time between the alleged beating and Hall's confession, along with the other facts related above, was sufficient to dissipate the taint of coercion in this case. Further, "[a] trial court's decision regarding the voluntariness of a confession will not be disturbed unless it is plainly wrong or clearly against the weight of the evidence."

Syl. pt. 7, *State v. Hickman*, 175 W.Va. 709, 338 S.E.2d 188 (1985), *quoting* syl. pt. 3, *State v. Vance*, 162 W.Va. 467, 250 S.E.2d 146 (1978). During the course of the suppression hearing, the trial judge had the opportunity to observe the officers and the appellant relating their respective versions of the events surrounding the confession, and the trial court ruled that the statement was given freely, voluntarily, and intelligently. Based on the totality of the circumstances, and in particular on the facts noted above, we affirm the trial court's ruling that the confession was voluntary and therefore admissible.[3]

## II. Prompt Presentment

■ The appellant argues that his written confession should not have been admitted because the State failed to promptly present him to a magistrate, in violation of W.Va.Code § 62-1-5 (1984).[4] *See also* W.Va.R.Crim.P. 5(a). In syllabus point 6 of *State v. Persinger*, 169 W.Va. 121, 286 S.E.2d 261 (1982), this Court held:

> The delay in taking the defendant to a magistrate may be a critical factor [in analyzing the voluntariness of a confession] where it appears that the primary purpose of the delay was to obtain a confession from the defendant.

In so holding, we recognized that an unjustifiable delay in taking the accused before a magistrate after his initial arrest may in some cases be sufficient to render a confession involuntary. 169 W.Va. at 137–138, 286 S.E.2d at 271. In syllabus point 4 of *State v. Hickman*, 175 W.Va. 709, 338

---

**3.** We do not by this holding mean to encourage police brutality that does not lead to immediate confession, or to encourage mental coercion by a pair of policemen, one playing the "good guy," and the other playing the "bad guy." Given the particular circumstances of this case, and the characteristics of Clarence Hall, the appellant, we do not believe that the accused's will was overborne by the police tactics employed. That is not to say that the same or similar techniques used in another case and another investigation would not lead to the exclusion of a confession.

Similarly, we note our strong disapproval of physical coercion of any kind. Confessions obtained through the use of physical brutality and torture cannot be admissible under any concept

of due process. *Williams v. United States*, 341 U.S. 97, 101, 71 S.Ct. 576, 579, 95 L.Ed. 774 (1951). Where it cannot be established that the coercion caused a confession, however, an accused's recourse is not the exclusion of the confession but the filing of charges against the officer for the assault itself.

**4.** West Virginia Code § 62-1-5 provides, in part:

An officer making an arrest under a warrant issued upon a complaint, or any person making an arrest without a warrant for an offense committed in his presence, shall take the arrested person without unnecessary delay before a [magistrate] of the county in which the arrest is made. .

S.E.2d 188 (1985), however, we subsequently held that:

> The rule stated in syllabus point 6 of *State v. Persinger* ... is not to be applied retroactively to a confession which was obtained prior to the date of that decision where no prompt presentment objection was made at trial.

Clarence Hall confessed on May 8, 1980, and his counsel made no objection at trial based on the prompt presentment issue. We decided *Persinger* on January 19, 1982. The nonretroactivity rule stated in syllabus point 4 of *State v. Hickman* therefore precludes application of the *Persinger* rule, because no prompt presentment objection was made in this case.

### III. Burden–Shifting Alibi Instruction

 The final issue raised in this appeal is whether the appellant is entitled to a new trial based upon the giving of the following instruction to the jury:

> The Court instructs the Jury that if you find from the evidence that the State has indeed established a prima facie case against this defendant, and if you further find that the defendant relies upon the defense of alibi, then the burden is upon him not beyond a reasonable doubt, nor even by a preponderance of the evidence, but only by such evidence and to such a degree of certainty, as will when the whole evidence is considered, leave in the mind of the Jury a reasonable doubt as to the guilt of the accused.

This is known as the *Alexander* alibi instruction, because it was approved by this Court in *State v. Alexander*, 161 W.Va. 776, 245 S.E.2d 633 (1978). This Court reversed *Alexander*, however, in *State v. Kopa*, 173 W.Va. 43, 311 S.E.2d 412 (1983), holding that the *Alexander* instruction improperly shifts the burden of persuasion from the prosecution to the defendant with respect to alibi. The Court went on to hold in syllabus point 2 of *Kopa* that the invalidation of the *Alexander* instruction was applicable only to those cases currently in

litigation or on appeal where the error had been properly preserved at trial. Further, the Court held in *State v. Hutchinson*, 176 W.Va. 172, 342 S.E.2d 138, 143 (1986), that the *Alexander* instruction could not be recognized as plain error in those cases where it had not been properly preserved at trial.[5]

The appellant in this case was convicted on November 17, 1980, and counsel made no objection to the *Alexander* instruction. *Kopa* was not decided until three years later, November 15, 1983. Counsel for the appellant urges us to reverse our ruling on the issue of plain error, but we decline to do so.

For the foregoing reasons, the judgment of the Circuit Court of Nicholas County is hereby affirmed.

Affirmed.

---

**5.** The Fourth Circuit Court of Appeals approved and followed the procedural holdings in *Kopa* and *Hutchinson* in the recent case of *Meadows v. Holland*, 831 F.2d 493 (4th Cir.1987). There, the court reversed *Adkins v. Bordenkircher*, 674 F.2d 279 (4th Cir.) *cert. denied*, 459 U.S. 853, 103 S.Ct. 119, 74 L.Ed.2d 104 (1982), on the issue of whether failure to object to an *Alexander* instruction at trial causes a procedural default.